**NOLAN BROTHERS, INC.**

v.

**The UNITED STATES.**

No. 371–67.

United States Court of Claims.
Feb. 19, 1971.

Charles E. Carlsen, Minneapolis, Minn., attorney of record, for plaintiff. Carlsen, Greiner & Law, Minneapolis, Minn., Jack D. Eades and Clark, West, Keller, Clark & Ginsberg, Dallas, Tex., of counsel.

M. Morton Weinstein, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant. Robert E. Tressel, Baltimore, Md., of counsel.

John A. McWhorter, Washington, D. C., amicus curiae, for The Associated General Contractors of America, Inc. King & King, Washington, D. C., Harold I. Rosen, Harrisburg, Pa., and Joseph M. Zorc, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS and SKELTON, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

"The claimant, Nolan Brothers, Incorporated, undertook in August 1962 to construct for the Corps of Engineers two rock jetties out into the Gulf of Mexico from Matagorda Peninsula in Texas. The contract price ultimately amounted to some nine million dollars. In March 1964, when about one-third of the work was done, the defendant exercised its contract right to terminate performance for the Government's convenience. The contractor did not contest this action but submitted, under the convenience-termination article, its termination claims on the total-cost basis, and efforts were made to settle the demands by negotiation. These were unsuccessful and, as the termination clause contemplated, the contracting officer then issued a unilateral determination in which he allowed the plaintiff $5,386,183 out of the $8,153,902 sought. Nolan Brothers appealed to the Corps of Engineers Board of Contract Appeals which granted only $101,315 more. This action followed." Nolan Brothers, Inc. v. United States, 405 F.2d 1250, 1252, 186 Ct.Cl. 602, 604 (1969). In that first opinion we held that the convenience-termination was lawful, and that an award pursuant to that provision of the contract was the contractor's sole remedy. Under that ruling, we dismissed, without passing on its truth, the first count of the petition in which the plaintiff alleged that the Government breached the contract by furnishing an inadequate design and defective specifications for the jetties, and also by negligently failing to apprise the contractor of certain facts. We then returned the case to the trial commissioner to consider, "on the basis of the administrative record under the standards of the Wunderlich Act", the remaining claim that the Board of Contract Appeals had been wrong in failing to enlarge the termination award.[1] The commissioner was also to consider the counterclaims filed by the Government

---

[1]. Our opinion said (405 F.2d at 1252, 186 Ct.Cl. at 604–605) : "In the second count of the petition plaintiff avers that the Board erred in several ways in refusing to increase the termination award. There is no dispute as to the method of handling this count in court. It is agreed that that part of the case will be reviewed on the basis of the administrative record under the standards of the Wunderlich Act. The parties' arguments on that phase are not now before us ; they will be presented initially to the trial commissioner for his recommendation."

attacking aspects of the case in which the Board upheld the contractor. Plaintiff asks for $1,272,555 additional, and the defendant demands $1,155,190 back.

Trial Commissioner Mastin G. White has written a careful and comprehensive opinion covering the termination-award issues still in dispute, and each of the parties has sought review of certain adverse parts of his recommendation.[2] We depart from him on the major question relating to pre-termination equipment ownership expense for interest, taxes, storage, and insurance. This is discussed in Part I of this opinion (along with related subsidiary matters). In Part II, we adopt, for the most part, Commissioner White's opinion on the remaining issues in the case.

I

*Pre-termination Equipment Ownership Expense*

The convenience-termination article (clause 23) provided (in paragraph (e)) that, in such a termination, the contractor should be reimbursed for: the total cost of all contract work performed prior to termination; the cost of settling and paying claims arising out of the termination under subcontracts or orders; the reasonable cost of the preservation and protection of property; any other reasonable costs incidental to the termination; and a specified percentage as profit. Under these standards, the parties have agreed that the

plaintiff is entitled to be reimbursed for the expense arising from the ownership of its equipment on the job prior to the termination of the contract. The parties do not agree, however, concerning the amount that should be allowed with respect to this item. The Board awarded $875,000 for equipment ownership expense during the pre-termination period. Plaintiff contends that the Board should have allowed it $1,502,956. On the other hand, the defendant alleges in one of its counterclaims that the plaintiff should have been given only $404,118, instead of $875,000.

■ 1. Nolan's controversy with the Board centers on the use of the Contractors' Equipment Ownership Expense Schedule, published by the Associated General Contractors of America, Inc. ("AGC"). This manual, first put out in 1920, is a widely-used guide to construction contractors' equipment ownership expense, reflecting both the experience of equipment owners throughout the country and also the average of operating conditions. In tabular form, the schedule lists numerous forms of construction equipment, and for each one gives the percentages of capital investment in the item to be charged off annually for the three following expense-categories: depreciation; major overhauling and repair; interest, taxes, storage, insurance. It also states the average number of months that the particular item is likely to be used per year, and the contractor's expense for that item per working month.[3]

---

2. Neither side asks for review of all the rulings of the commissioner adverse to it, but only of some of those holdings.

3. For example, for one type of portable gasoline air compressor, the manual provides as follows:

| Average annual expense, percent of capital investment without field repairs | | | | Average use, months per year | Expense per working month, percent |
|---|---|---|---|---|---|
| Depreciation | Overhauling, major repairs, painting | Interest, taxes, storage, insurance | Total ownership expense | | |
| 25 | 15 | 11 | 51 | 6 | 8.5 |

The theory of the Schedule, to use its own words, is that "the annual equipment expense * * * must be recovered by a contractor from the work that he performs. To do this, it is necessary to establish for each item a monthly charge of such amount that when multiplied by the average of working months it will yield a revenue equal to the annual expense * * *." For instance, the expense of storing equipment between jobs must be recovered from the jobs worked, even though no storage may have occurred during the performance of those particular jobs. All proper expenses during the life of the item are allocable and allocated to the periods the equipment is actually working.

In determining the amount of plaintiff's pre-termination equipment ownership expense, the Board based the allowances for depreciation, and for major repairs and overhaul, on this AGC Schedule, but it did not do the same for interest, taxes, storage, and insurance. For those classes of cost, it declined to follow the Schedule. Nothing was allowed for interest, and the sum for taxes, storage, and insurance was based on figures said to be the plaintiff's actual expenditures, with respect to the equipment, for those cost-elements during the pre-termination period. Plaintiff's claim is that the AGC Schedule should have been used for the latter group of cost-items, as well as for depreciation and major overhaul. The defendant supports the Board.

The settlement of this dispute turns, not so much on general principles of contract law or on judicial precedent, as on the provisions of a particular Defense Department regulation. The convenience-termination clause in this contract expressly said that "any determination of costs" for a unilateral (*i. e.* nonnegotiated) termination award, such as we have here, "shall be governed by the principles for consideration of costs set forth in Section 15, Part 4 of the Armed Services Procurement Regulation, as in effect on the date of this contract." One of those cost principles is contained in ASPR 15–402.1, which deals with the very subject before us.[4]

4. ASPR 15–402.1 provides as follows:
"15–402 Selected Costs.
"15–402.1 *Construction Plant and Equipment.*
"(a) The widely varying conditions of climate, terrain, etc. applicable to individual Government construction projects make it impracticable to determine accurately the actual costs of depreciation of construction plant and equipment used on individual contracts. In addition, in certain cases it may be extremely difficult to determine or allocate accurately the cost of overhaul or repairs applicable in an individual contract since the period of incidence of such cost may not correspond with the period of benefit derived therefrom. Therefore, uniform rates covering depreciation, and where appropriate overhaul and repair costs, shall be used to provide equitable average compensation to contractors for the use of construction plant and equipment under Government contracts. Two separate rate schedules are available for this purpose. The rate schedule contained in DOD Instruction 4105.2, referred to in subparagraph (b), is generally appropriate to the types of construction projects awarded under cost-reimbursement type contracts; whereas, the rate schedule referred to in subparagraph (c), published by the Associated General Contractors of America, Inc., is generally appropriate to the types of construction projects awarded under fixed-price type contracts. Accordingly, unless the contract specifically provides to the contrary, usage costs for construction plant and equipment under cost-reimbursement type contracts and fixed-price type contracts shall be determined as provided in paragraphs (b) and (c), respectively.
"(b) Allowable costs for construction plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor with the approval of the contracting officer for use under cost-reimbursement type contracts shall be based on the provisions of DOD Instruction 4105.2 in effect as of the date of the contract with respect to (i) uniform rental rates in lieu of depreciation, overhead and profit, and (ii) the costs incident to major, minor and running repairs, complete and thorough overhaul, and, loss or destruction of equipment.
"(c) Evaluation of costs for the use of construction plant and equipment, in sound and workable condition, which are

The meaning and reach of that regulation controls the answer to the controversy. None of the earlier decisions bearing on the AGC Schedule directly involved such a regulation; all were decided as a matter of the common-law of determining contract damages or awards.[5]

The contractor's position on the ASPR regulation is that this directive mandates use of the AGC Schedule, not only for depreciation and major overhaul, but also for interest, taxes, storage, and insurance. The Board and the trial commissioner, however, consider the Schedule not to be obligatory for the latter group, and defendant supports those rulings. Each side plucks different portions of the ASPR section for sustenance.

Looking solely at the wording of § 15.402.1, *supra*, note 4, one might be hard put to decide which position is correct. Paragraph (c) appears to favor the plaintiff. It starts out with the flat declaration that "evaluation of costs for the use of construction plant and equipment * * * which are owned or controlled by a contractor or subcontractor and are furnished for the proper and economical performance of a fixed-price type contract [as in this case] *shall be based upon*" the AGC Schedule (emphasis added). This seems to be an unqualified command to use the whole Schedule, not simply a part of it. The same paragraph also says, later on: "The allowance for equipment ownership expense, computed as provided herein, shall be considered to include all costs of depreciation, major repairs and over-

owned or controlled by a contractor or subcontractor and are furnished for the proper and economical performance of a fixed-price type contract shall be based upon the 'Contractors' Equipment Ownership Expense Schedule' published by the Associated General Contractors of America, Inc. in effect as of the date of the contract. This represents a percentage of acquisition cost per working month or fraction thereof for the period of time the equipment is required for the job. If the equipment has already exceeded the assigned service life indicated by the precentage used for depreciation, one year shall be added to the actual age of the equipment and the depreciation percentage shall be revised accordingly. The allowance for equipment ownership expense, computed as provided herein, shall be considered to include all costs of depreciation, major repairs and overhaul, and overhead applicable to the equipment. Accordingly, there shall be eliminated from all direct and indirect charges under the contract all costs applicable to items of equipment which are included in the allowance for ownership expense. In considering total costs under any contract, no allowance for overhead shall be applied to the allowance for equipment ownership expense. Since costs incident to maintenance and minor and running repairs are not reflected in the ownership Schedule, separate allowance shall be made therefor. In periods of suspension of work for the convenience of the Government under an appropriate contract

clause, the allowance for equipment ownership expense shall not exceed 50 percent of the amount computed as herein indicated. Notwithstanding any sale and leaseback, or the acquisition of construction plant and equipment by individuals, firms, corporations, or trusts, other than the contractor, and the leasing or rental of such construction plant and equipment to the contractor, the amount to be considered as a cost covering the use of such equipment shall not exceed the allowance for ownership expenses computed as indicated herein. Under certain circumstances, because of the long duration, special nature, or location of the work, it may be more economical to charge the net cost of items of construction plant and equipment directly against a contract in lieu of use of the ownership Schedule. In such cases, where the contract, record of negotiations, or attendant circumstances indicate that particular items of construction plant and equipment were purchased for use solely under a specific contract the cost of such items, less their proper resale or salvage value, may be charged to the contract as a direct charge, together with costs of repairs, overhaul, and maintenance incident thereto."

5. *See, e. g.*, L. L. Hall Constr. Co. v. United States, 379 F.2d 559, 564, ff. 177 Ct. Cl. 870, 880 ff. (1966) ; Bennett v. United States, 371 F.2d 859, 178 Ct.Cl. 61 (1967) ; L. P. Reed, Inc., Eng. BCA Board Decision No. 711, pp. 21–22 (1955).

haul, *and overhead applicable to the equipment*" (emphasis added). "Overhead applicable to the equipment" is one compendious way of covering "interest, taxes, storage, and insurance", and the sentence is most easily read as saying that an allowance based on the AGC Schedule will include those items, as well as depreciation and major overhaul. Defendant argues that the next two sentences of the paragraph show that these items (taxes, insurance, etc.) are not to be included except to the extent actually and properly incurred, but we think that those sentences do no more than caution that, when the AGC Schedule is used, all other allowances for depreciation, major overhaul, and overhead (including the items of taxes, storage, etc.) should be eliminated from the calculation of direct and indirect costs, so as to avoid duplication. Nothing else in paragraph (c) detracts from the indications, mentioned above, that the full Schedule is to be used, not only the entries for depreciation and major overhaul.

On the other hand, paragraph (a) does look the other way, in large part. It talks only of depreciation and major overhaul and explains why the AGC Schedule should be used for those items. Nothing at all is said about overhead, and there is no reference to interest, taxes, storage, or insurance. However, as plaintiff stresses, the paragraph does end with the direct and unqualified statement that "Accordingly, unless the contract specifically provides to the contrary, usage costs for construction plant and equipment under cost-reimbursement type contracts and fixed-price type contracts shall be determined as provided in paragraphs (b) and (c), respectively."

We think that the catalyst which brings these disparate elements of § 15–402.1 into a homogenized solution is the history of the drafting of the provision—a useful aid which we can rightly employ (*cf.* General Builders Supply Co. v. United States, 409 F.2d 246, 248–249, 187 Ct.Cl. 477, 480–481 (1969)).[6] In 1960, the ASPR Committee of the Defense Department appointed a Special Subcommittee to consider cost principles for construction contracts. Among the Subcommittee's initial proposals was, in substance, what is now paragraph (c) of § 15–402.1. At the discussion before the full Committee, the Chairman of the Subcommittee defended use of the AGC Schedule and indicated, unmistakably, that the Schedule was to apply to "depreciation, overhaul, repair, interest, taxes, insurance, storage." The interest item of the Schedule was discussed in particular,[7] and there was no doubt that the "interest, taxes, insurance, and storage" entry was to be used, along with depreciation and major overhaul. The Committee minutes show that the "consensus of the members was to permit the policy of using AGC schedules to stand. However, the Special Subcommittee was requested as a separate effort to develop a detailed rationale for the use of the AGC Schedule in lieu of a DOD [Department of Defense] developed document, pointing out the ease of administration and the equity involved."

The Subcommittee rationale, supplied later, first gave reasons why, for fixed-price agreements, use of the AGC Schedule was preferable to a new detailed Defense Department directive specifying government rates or amounts or percentages (such as was available for cost-reimbursement type contracts). Then,

---

6. The history of the Section has been supplied us in the AGC's amicus brief. Neither party quarrels with the accuracy of that presentation which is based on published documents.

7. The Subcommittee Chairman contended, according to the minutes, "that the interest which is included in the AGC Schedule is compensated for by the disallowance of overhead where ownership expense is involved. Actually this represents a tightening up of the previous policy where in termination situations interest was allowed and overhead as well."

in describing the proposed regulation adopting the Schedule (the part which is now paragraph (c) of § 15.402.1), the report employs these significant sentences:

The AGC Schedule develops the ownership expense of construction plant and equipment per working month expressed as a percent of acquisition cost. The monthly allowance completely reimburses the contractor for depreciation (based on assigned service life and average working months per year), overhauling and major repairs, and also includes 11% for interest, taxes, storage and insurance. As interest is not an allowable expense and as costs representing taxes, storage and insurance would appear in the overhead expense account of the contractor, your Subcommittee has recommended that such 11% be considered as complete reimbursement for all overhead expenses applicable to such equipment. Therefore, 15–402.-1(b) [now 15.402.1(c)] specifically states that the allowance for equipment ownership expense computed by using the AGC Schedule shall be considered as completely including all costs of depreciation, major repairs and overhaul, and overhead. Accordingly, in considering total costs under any construction contract no separate allowance for overhead is to be applied to the allowance for equipment ownership expense.

The minutes of the ASPR Committee show no dissent from this declaration. The paragraph which is now § 15.402.-1(c) was slightly (and immaterially) revised into the form in which it was promulgated in 1961 and in which it governs this case. It seems, however, that paragraph (a) of the Section was added after the Subcommittee's report on the rationale for using the AGC Schedule. We have no information on the reasoning which prompted that addition, and the ASPR Committee's minutes do not discuss it. In particular, there was no hint that this new paragraph (a) was designed to counteract or contradict the general reach and scope of paragraph (c).

This history amply confirms that paragraph (c), taken by itself, means what it says in words, i. e., under that paragraph the AGC Schedule is to be used, not only for the items of depreciation and overhaul (or repair), but also for the comprehensive item entitled "interest, taxes, storage, insurance." The ASPR Committee made it clear that the term "overhead applicable to the equipment", in this paragraph, covers that over-all item in the Schedule. The text and the drafters' purpose, as revealed in the history, coincide admirably.

What, then, is the function of paragraph (a), with its strong emphasis on depreciation and overhaul-repair? We repeat that there is no intimation in the history or wording of paragraph (a) that the full ASPR Committee was dissatisfied with the impact of paragraph (c), as that provision had been drafted and explained by the Subcommittee and its Chairman. On the contrary, the minutes show nothing but approval. Nor would it be reasonable for the full Committee to promulgate paragraph (c) in the form prepared by the Subcommittee if the purpose of the addition of paragraph (a) was to deprive (c) of most of its content. If the aim were to limit general use of the AGC Schedule to depreciation and overhaul, paragraph (c) should and could have been eliminated or changed drastically in its wording. We cannot, therefore, follow defendant in its argument to the effect that, under paragraph (a) of § 15–402.1, the use of the AGC Schedule for taxes, storage, interest, and insurance is precisely the same as if paragraph (c) were not there and the common law rules (see note 5, *supra*) were the only ones operating. The addition of paragraph (a) must have had some other purpose.

There is a clue to the true function of paragraph (a) in the foreword to the AGC Schedule which points out that the listed rates "are subject to adjustment to fit the experience of the individual contractor", that the Schedule should

"be used as a guide, and it is recognized that individual experience may vary within a fairly broad range from the averages shown here", and that "the rates are not determinable by any precise method of accounting and should always be applied in the light of individual experience." The Manual itself thus allows for deviation and adjustment in individual cases. We think that the special role of paragraph (a) of § 15–402.1 is to provide that this kind of individual adjustment should rarely, if ever, be used for the items of depreciation and major overhaul. Instead, *"uniform* rates covering depreciation, and where appropriate overhaul and repair costs, *shall* be used * * *" (emphasis added). The exceptions with respect to those two categories are to be kept to the barest minimum because uniformity is the dominant goal.[8]

On the other hand, since paragraph (a), with its stress on uniformity, does not mention the Schedule's comprehensive item for interest, insurance, taxes, and storage, we judge that use of that comprehensive entry, under the provisions of paragraph (c), is permitted by the regulation to be subject to the Schedule's general prescription that individual adjustments are permissible if there is demonstrated need for such special treatment. The leeway is greater than for depreciation or overhaul. But the presumption is nevertheless still in favor of the Schedule—on which the regulation declares that the "evaluation of costs" "shall be based"—and the burden of proof is on the party (contractor or Government, as the case may be) desiring a deviation from the Schedule to show that an individual or particularized

departure is warranted and ought to be made. Unless there is a persuasive, specific showing that the Schedule rate should not be used, that is the rate which is to control.

The Board did not, in our view, operate under this standard with respect to the comprehensive item now in question. It gave no presumptive weight at all to the Schedule rates but held them entirely inapplicable—as if the common law of quantum applied to its full extent—and ruled that "under applicable cost principles appellant [plaintiff] should receive only its actual outlay for taxes, storage, and insurance, and none for interest." The award was only for what the Board deemed the contractor's actual expenditures for taxes, storage, and insurance. By-passing for the moment the question of whether the Board correctly determined those actual costs, we hold that the mere ability to compute actual costs during the pre-termination period is not in itself a sufficient ground for avoiding use of this item of the AGC manual. There must, in addition, be proof by the party desiring use of actual costs that these costs are either (a) adequately representative of the particular contractor's normal or average costs (in other words, a proper substitute for the AGC rate, which takes account of the full life of the equipment and its lifetime cost),[9] or (b) attributable to some special factor or feature which makes it inappropriate or unfair to use average or normal costs (either the AGC average or the contractor's own average) in the particular instance. No such inquiry was made by the Board here, nor did the Government undertake to bear the burden of showing that the AGC rate

---

8. The wording of paragraph (a) allows a somewhat greater possibility of deviation for overhaul than for depreciation, but still less, we think, than for taxes, storage, insurance, and interest.

9. The AGC Schedule is designed to recover for the contractor those fixed costs which must be borne no matter how much or how little each piece of equipment is used, e. g. storage between jobs, and also to

average out these expenses over the various jobs on which the equipment is used. It is often difficult, as with taxes, to identify a particular payment of an expense with a particular contract, even the contract which may be in the course of performance when the payment is actually made. Averaging, balancing, and spreading-out are therefore utilized in the Schedule, and necessarily so.

should be discarded. That rate was simply eliminated from consideration as irrelevant because (in the Board's view) "actual costs" were available.

Moreover, we have considerable doubt whether the Board accurately determined the actual costs it allowed. The difficulty is that, at the contracting officer's level, both sides (the contractor and the contracting officer) assumed that the AGC Schedule was applicable across-the-board (including the item for interest, taxes, storage, and insurance), and both sides made their calculations on that basis. In fact, the contracting officer followed the Schedule on this comprehensive item and allowed the Schedule rate. It was not until the Board level that the Government's position changed. But by that time the plaintiff and the contracting officer, both acting on the assumption that the AGC rate was to be used, should, and may very well have, eliminated from all direct and indirect charges (under the mandate of § 15–402.1(c)) expenses attributable to interest, taxes, storage, and insurance—since those classes of costs would be covered by the AGC percentage. At least this is what plaintiff strenuously charges before us when it urges that the trivial amount the Board gave for taxes, insurance, etc. ($1,633) is totally inaccurate because it represents only the few direct and indirect costs which were not eliminated on the original assumption that the allowance of the AGC rate would cover the major costs for those categories. If this is so, plaintiff has not been treated fairly, in the determination of these costs. We do not resolve this issue—defendant just as strenuously rejects plaintiff's point, and there is complicated discussion of the issue by both parties—but leave it to the Board to canvass when the case returns there, if actual costs remain important to the case. The record as it comes to us is not in satisfactory shape to settle the matter.

For these reasons, we set aside the administrative determination of the allowances for interest, taxes, storage, and insurance, and suspend proceedings here so that the parties may return to the Board for a determination of those amounts under the standard set out above, i. e. use of the AGC Schedule rate unless the Government proves that there is special and good reason to employ some other method, such as actual costs (correctly calculated).

■ 2.[10] The defendant's fifth counterclaim, which asserts that the Board should have allowed the plaintiff only $404,118 (instead of $875,000) for equipment ownership expense, raises a question concerning the usage time with respect to which the AGC rates should have been applied by the Board in making allowances for depreciation and for major repairs and overhaul on the equipment which the plaintiff had at the job site during the pre-termination period.

The AGC monthly rates are based on the average use of equipment during a single operating shift of 8 hours a day for 6 days per week, or 176 hours per month. This plaintiff operated during the pre-termination period on the basis of a daily 10-hour shift for 6 days a week, except that two 10-hour shifts were worked each day during the May-November period in 1963, and the job was more or less on a standby basis from January 24, 1964, until the work under the contract was terminated on March 27, 1964.

The plaintiff had 171 pieces of equipment on the job. However, it did not keep records showing the hours during which each piece of equipment was actually used in the performance of work under the contract. The records did contain data regarding the payroll time

10. In this portion of the opinion, we incorporate, with slight modifications, Trial Commissioner White's discussion of the defendant's counterclaim as to equipment ownership expense. The defendant does not except to the commissioner's disposition of this claim.

of equipment operators. Such data showed for each operator the number of hours worked, the classification of the work done, and, in some cases, the identification number of the machine operated by him. The Board concluded—on the basis of evidence that can reasonably be regarded as substantial—that the payroll data did not fully reflect the extent to which the various pieces of equipment on the job were used for more than 176 hours per month, so as to require an upward adjustment of the allowances, based upon the AGC rates, for depreciation and for major repairs and overhaul on account of the overtime use of equipment. In the absence of precise information concerning the extent to which the plaintiff's equipment was subjected to overtime use on the job, the Board, in effect, made a "jury verdict" type of adjustment for the overtime usage of equipment.

The Board's action in making this adjustment was reasonable. In any event, the defendant has not supported its fifth counterclaim by pointing out evidence in the administrative record clearly establishing that the Board's action was unreasonable.

The defendant also contends in this counterclaim that the sum of $875,000 which the Board allowed the plaintiff as reimbursement for pre-termination equipment ownership expense duplicated to some extent amounts which had already been included by the plaintiff and the defendant in the agreed figure of $3,575,559 covering direct costs.

As previously indicated, the Board made an allowance to the plaintiff on the basis of the AGC schedule of rates that was designed to reimburse the plaintiff for all costs of major repairs and overhaul necessitated by the use of the plaintiff's equipment in the performance of work under the contract. The defendant alleges that the plaintiff, in addition to receiving reimbursement for major repairs and overhaul on the basis of the AGC schedule of rates, was also reimbursed for some expenditures on major repairs and overhaul in the

agreed figure of $3,575,559 covering direct costs.

The evidence in the administrative record indicates that the direct costs figure of $3,575,559 included an amount of $209,859 representing actual expenditures by the plaintiff for the repair and overhaul of equipment during the pre-termination period. The defendant raises a question as to whether such expenditures related exclusively to minor repairs and overhaul, or whether they covered some major repairs and overhaul and thus duplicated to that extent the Board's allowance for major repairs and overhaul on the basis of the AGC schedule of rates.

It appears from the evidence in the administrative record that the plaintiff, in its accounting system relative to equipment expense, did not differentiate as between the cost of minor repairs and overhaul, on the one hand, and the cost of major repairs and overhaul, on the other hand. It further appears that all the actual expenditures which the plaintiff made for repairs and overhaul during the pre-termination period were included in the agreed direct costs.

The defendant has cited various portions of the administrative record containing evidence as to activities—such as steam-cleaning sandblasting, painting, welding, and replacement of wornout tires—undertaken by the plaintiff in connection with the repair and overhaul of equipment during the pre-termination period. The costs of such activities were ultimately included by the plaintiff and the defendant in the agreed direct costs. The defendant does not, however, attempt to separate the activities in question into two categories, (1) those which the defendant regards as constituting major repairs and overhaul, and (2) those which the defendant regards as constituting minor repairs and overhaul. Instead, the defendant states that under a formula as to the relationship between major repairs and minor repairs—which formula is based upon the experience of the Southern Pacific Division, U.S. Army Corps of Engineers, and

has been incorporated in a manual issued by the Chief of Engineers for use in preparing Government estimates—the figure of $209,859 previously allowed the plaintiff as reimbursement for direct costs of repairs and overhaul should be regarded as consisting of $89,942 for minor repairs and overhaul, and of $133,801 for major repairs and overhaul. Thus, according to the defendant, the amount of $133,801 should be regarded as having been duplicated by the Board's separate allowance for major repairs and overhaul on the basis of the AGC schedule of rates.

The defendant has the burden in its fifth counterclaim of clearly demonstrating to the court—instead of asking the court to surmise—that the agreed direct costs included expenditures for major repairs and overhaul of equipment. The defendant has not met this burden.

Accordingly, defendant is not entitled to recover on its fifth counterclaim which is dismissed.

## II

In this Part we incorporate and adopt Commissioner White's opinion on the remaining claims in the case—except for his treatment of a mathematical error of $10,000 made by the Board (under "Pre-Termination G & A Expense"), and for a minor statement (under "Post-Termination Dismantling and Restoration Expense") which follows his view that the AGC Schedule need not be used for taxes, interest, storage, and insurance (a view from which we depart in Part I, *supra*).

### *Tire Expense* [11]

The plaintiff alleges that the Board erred in refusing to allow the plaintiff $35,958 to cover the estimated costs of replacing rubber tires on certain equipment owned by the plaintiff and used in the performance of work under the contract during the pre-termination period.

The evidence before the Board showed that the plaintiff expended $9,332 for tires and tire repairs during the pre-termination period for repairs to rock wagons, loaders, maintainers, trucks, and automobiles used on the project, which included the purchase of tires; and that the plaintiff was allowed reimbursement for such sums as part of the direct costs on which the parties reached an agreement during their negotiations.

The evidence also showed that certain other tires on equipment which the plaintiff used in the performance of work under the contract were new at the time when the work was begun; that these tires were so worn by the time when the work under the contract was terminated that they could not be used by the plaintiff on subsequent jobs; and that the cost of replacing such tires would amount to $35,958. These tires had not actually been replaced at the time of the hearing before the Board.

The Board rejected the plaintiff's claim in the amount of $35,958 for tire expense, stating that "Reimbursement for the cost of maintenance and running repairs stops as soon as the contract work stops."

The Board erred in denying this claim. Under the formula set out in paragraph (e) of clause 23 of the contract, the plaintiff was entitled to be reimbursed for the *total cost* of all contract work performed prior to the termination. The expense involved in replacing tires worn out as a result of the operation of the plaintiff's equipment on the job during the pre-termination period was such a cost, irrespective of whether the actual replacement of such tires occurred during the pre-termination period or after the work under the contract was terminated.

In this connection, it should be noted that tire wear during the pre-termination period was not covered by the Board's allowance for major repairs and overhaul (based upon the AGC schedule of rates) in determining the amount of

11. The defendant excepts to this portion of the commissioner's opinion, but we reject the exception.

the plaintiff's pre-termination equipment ownership expense. Tire expense is an operating expense and could not properly be regarded as coming within the category of major repairs and overhaul.

It necessarily follows that the plaintiff is entitled to recover $35,958 in the present action on its claim for tire expense.

### Pre-Termination G & A Expense [12]

The Board allowed the plaintiff $78,805 as reimbursement for general and administrative (G & A) expense incurred during the pre-termination period. The plaintiff asserts in the present action that the Board should have allowed it $210,704 for such expense.

In its third counterclaim, the defendant contends that the Board should have allowed the plaintiff only $69,241, instead of $78,805, as reimbursement for G & A expense during the pre-termination period.

The plaintiff's claim under this heading raises, first, a question concerning the propriety of the Board's action in excluding bonuses at the rate of $20,000 per year each which the plaintiff accrued in favor of its two principal officers, Charles Nolan, President, and William Nolan, Vice President, for 1963 and the first 3 months of 1964, and in excluding the salary which the plaintiff paid to W. L. Nolan, Chairman of the plaintiff's Board of Directors, in 1963 and early 1964, when the Board was in the process of establishing a "pool" of G & A (or home-office overhead) expense common to all of the plaintiff's construction jobs during the pertinent 1962–64 period, as a preliminary to allocating a fair share of such overhead expense to the contract that is involved in the present litigation.

ASPR 15–205.6(c) is pertinent to the point now under consideration. It provides in part as follows:

* * * [C]ash bonuses * * * are allowable to the extent that the overall compensation is determined to be reasonable and such costs are paid or accrued pursuant to an agreement entered into in good faith between the contractor and the employees before the services were rendered, or pursuant to an established plan followed by the contractor so consistently as to imply, in effect, an agreement to make such payment * * *.

In the present case, there is no evidence in the administrative record concerning any prior formal agreement between the plaintiff and its principal officers with respect to the payment of bonuses.

Furthermore, the evidence fails to show that bonuses were paid to the principal officers pursuant to an established plan which the plaintiff followed so consistently as to imply an agreement on the matter. No bonuses were paid to these officers in 1961, the year before the plaintiff entered into the contract with the defendant. Bonuses in the amount of $5,000 each may have been awarded to such officers in 1962, but it is not really clear from the evidence in the administrative record whether $5,000 awards to the principal officers in 1962 represented bonuses or salary increases. The first written record of the 1963 bonuses in the amount of $20,000 each to the principal officers appears to have been contained in the plaintiff's financial statement for 1963, which was dated and released on July 23, 1964, approximately 4 months after the termination of the work under the contract. With respect to the 1963 bonuses of $20,000 each to the principal officers, it is pertinent to note that whereas the plaintiff made a gross profit of $21,184 in 1962, it incurred a loss of $446,089 in 1963, not including any profit or loss in connection with the contract.

With respect to 1964, the plaintiff accrued bonuses for the first quarter of

12. The plaintiff does not except to the commissioner's disposition of its claims under this heading. The defendant excepts only to the commissioner's treatment of the $10,000 mathematical error, and we agree with that exception.

1964 at the rate of $20,000 per year in favor of each of its two principal officers, but did not accrue any bonuses for these officers with respect to the remainder of 1964.

Since the evidence in the administrative record fails to show that the bonuses to the plaintiff's principal officers were awarded pursuant to an express or an implied agreement, the Board acted properly under ASPR 15–205.6(c) in excluding such bonuses when the Board was in the process of establishing the "pool" of G & A expense for subsequent allocation.

■ In so far as the salary payments in 1963 and early 1964 to W. L. Nolan, Chairman of the plaintiff's Board of Directors, are concerned, the evidence in the administrative record indicates that Chairman Nolan had previously retired from active service but that he was recalled to duty in 1963, supposedly to render assistance in connection with the financial aspects of the plaintiff's operations under the contract. However, there is no persuasive evidence in the record indicating that Chairman Nolan actually performed any services pertaining to the contract that would justify a charge against the contract based upon his salary. Consequently, the Board did not err in excluding the salary payments to W. L. Nolan from the "pool" of G & A expense.

Both in connection with the bonuses to Charles Nolan and William Nolan, and in connection with the salary payments to W. L. Nolan, the circumstance that the Board was dealing with bonuses and salary payments from a family-owned corporation to officers who were members of the family justified close scrutiny by the Board in order to determine whether the bonuses and salary payments represented reasonable compensation for actual services performed, or really constituted a distribution of the corporation's earnings. *Cf.* Northlich, Stolley, Inc. v. United States, 368 F.2d 272, 278, 177 Ct.Cl. 435, 443–444 (1966).

The plaintiff's claim for an additional amount as G & A expense during the pre-termination period also raises a question concerning the propriety of the allocation which the Board made to the contract out of the "pool" of G & A expense previously mentioned.

■ The plaintiff had four construction jobs in progress during the 1962–64 period that is involved in the present litigation. The Board allocated the "pool" of G & A expense for the pertinent period among the four projects proportionately, on the basis of the job costs incurred by the plaintiff in connection with the respective projects. This method of allocation was not objectionable, as contended by the plaintiff. On the contrary, it was in accordance with acceptable accounting practice. L. L. Hall Constr. Co. v. United States, *supra,* 379 F.2d at 569, 177 Ct.Cl. at 887. The administrative record does not contain evidence establishing that the project under the contract placed such an abnormal demand upon the plaintiff's home office as to require that the Board allocate to this project an abnormally large share of the G & A expense in the "pool".

It is concluded that the grounds cited by the plaintiff as supporting its entitlement to recover, as G & A expense during the pre-termination period, an amount greater than the sum of $78,805 which the Board allowed the plaintiff for this purpose are unsound.

It is said, however, that the Board made a mathematical error prejudicial to the plaintiff in determining the amount due the plaintiff as G & A expense during the pre-termination period. The Board allocated to the contract, out of the "pool", $1,517 for 1962, $67,406 for 1963, and $19,882 for the first quarter of 1964. The Board then said that "We find that the total of these three amounts, or $78,805, is the proper and reasonable amount of G & A expense chargeable to the completed portion of the terminated contract." Actually, the total of these three amounts is $88,805, and not $78,805. The trial commissioner therefore ruled that plaintiff was entitled to an appropriate adjustment upward of $10,000 in the figure for G & A

expense during the pre-termination period. In its exception to this ruling, defendant shows conclusively that the Board's typographical error was not in the process of addition but rather in copying the figure for the year 1963 which should have been $57,406 (instead of $67,406). There was no error in the final amount, which should remain at $78,805.

■ In its third counterclaim, the defendant says (among other things) that the Board, when it was establishing the "pool" of G & A expense for the pre-termination period, should have excluded salary increases at the rate of $5,000 per year which the plaintiff awarded to each of its principal officers, President Charles Nolan and Vice President William Nolan, for 1963 and the first quarter of 1964.

The Board determined that these salary increases were reasonable in the light of the considerable duties and responsibilities which the plaintiff's principal officers discharged in 1963 and the first quarter of 1964. They were operating a company which, as previously indicated, had four construction projects in progress; and one of these projects was a 9-million-dollar job. Even with the $5,000 increases, the salaries of these officials amounted only to $20,000 per year each. It appears, therefore, that the Board was justified in concluding that the $20,000 salaries were not unreasonably high.

■ The defendant also contends in its third counterclaim that the Board, when it established the "pool" of G & A expense, erred in including $1,825 for 1962, $1,825 for 1963, and $457 for 1964, as depreciation on office equipment and automobiles at the home office.

The Board did not have before it data from the plaintiff's books of account with respect to depreciation on office equipment and automobiles at the home office during 1962 and 1963. However,

there was evidence derived from the plaintiff's books as to such depreciation for the first quarter of 1964 and the 13-month period immediately following the first quarter of 1964. From such evidence, the Board extrapolated that the figures of $1,825 for 1962, $1,825 for 1963, and $457 for the first quarter of 1964 were reasonable "pool" allowances for depreciation on office equipment and automobiles at the home office during the pre-termination period. It appears that the Board's action in this respect was based upon evidence which may properly be regarded as substantial.

■ Finally, the defendant asserts in its third counterclaim that the Board erred when it included $425 for 1962 donations and $250 for 1963 donations in the "pool" of G & A expense.

The defendant's position with respect to donations is well taken. The figures for donations should have been excluded from the "pool" of G & A expense in accordance with ASPR 15–205.8, which plainly states that "Contributions and donations are unallowable."

The "pool" of G & A expense for 1962 totaled $78,705, and the Board allocated $1,517 of this total, or 1.9 percent, to the contract. Therefore, the Board's erroneous action in adding donations of $425 to the "pool" for 1962 ultimately resulted in an erroneous allowance of $8.08 to the plaintiff in connection with the item of G & A expense during the pre-termination period.

The "pool" for 1963 totaled $89,425, and the Board allocated $57,406 of this total, or 64.19 percent, to the contract. Hence, the Board's erroneous action in adding 1963 donations of $250 to the "pool" ultimately resulted in an erroneous allowance of $160.48 to the plaintiff as part of the G & A expense during the pre-termination period.

To sum up, the defendant is entitled to recover $168.56 ($8.08+$160.48) on its third counterclaim.

### Standby Equipment Ownership Expense [13]

■ The plaintiff contends that the Board should have allowed it $173,654 to cover equipment ownership expense for a period of 2.6 months immediately following the termination of the contract.

The plaintiff states that 2.6 months represented a reasonable period of time for the removal from the job site of the plaintiff's equipment which had been used in the performance of work under the contract prior to the termination and which necessarily became idle after the defendant terminated the contract on March 27, 1964. It is the plaintiff's position that the Board should have recognized its entitlement to an allowance for equipment ownership expense during this standby period of 2.6 months immediately following the termination of the contract.

The Board's conclusion concerning this particular matter was stated in the following language:

* * * [C]harges for equipment begin to run when the equipment is shipped to the jobsite but stop when the contract is completed. In the present case, the only allowable post-termination equipment ownership costs are those reasonably incurred by appellant [plaintiff] for the use of equipment in work incidental to the termination and for freight out. We have determined and made allowances for these costs below.

Paragraph (e) of clause 23 of the contract provided that the plaintiff should be reimbursed for "*any* * * * reasonable costs incidental to termination of work under this contract * * **"* (emphasis supplied). When the contracting officer terminated the work under the contract on March 27, 1964, the result was that valuable equipment which the plaintiff had brought to the job site in order to build jetties under the contract suddenly became idle and useless, at

least for a temporary period. In considering a somewhat similar situation, this court said in Brand Investment Co. v. United States, 58 F.Supp. 749, 751, 102 Ct.Cl. 40, 45 (1944), cert. denied, 324 U.S. 850, 65 S.Ct. 684, 89 L.Ed. 1410 (1945):

* * * [W]hen the Government, * * * in effect condemns a contractor's valuable and useful machines to a period of idleness and uselessness, we think that it should make compensation comparable to what would be required if it took the machines for use for a temporary period, but did not in fact use them. As a jury verdict, we allow the proved rental value, discounted by one-half because of the absence of actual use with its resulting wear and tear. * * *

It is believed, therefore, that the plaintiff's equipment ownership expense during the standby period immediately following the termination of the contract should properly be regarded as coming within the category of "reasonable costs incidental to termination of work under this contract," and that the Board erred in wholly rejecting the plaintiff's claim based upon this item of expense.

On the other hand, the plaintiff did not present persuasive evidence establishing clearly that it was entitled to receive reimbursement for standby equipment ownership expense in the amount of $173,654. In this connection, the contracting officer held, in his decision of July 15, 1965, that the plaintiff might reasonably have been expected to start moving its equipment from the job site to storage by April 15, 1964; that an additional month after that date would have constituted a reasonable time within which to complete such movement; that, accordingly, the plaintiff was entitled to be reimbursed for equipment ownership expense over a period of 1.6 months; that it was proper to use for this purpose one-half of the monthly

---

13. Defendant excepts to the adverse portions of this part of Commissioner White's discussion. We reject that ex- ception. Plaintiff does not except to the partial ruling against it.

rate that was used to compute the plaintiff's equipment ownership expense during the pre-termination period, when the plaintiff's equipment was actually working on the job; and that, on such basis, the plaintiff was entitled to receive $66,030 to cover equipment ownership expense during the standby period immediately following the termination of the contract. This seems to have been a reasonable determination in the light of the available evidence. However, under the Supreme Court's interpretation of the Wunderlich Act in the case of United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 430 & n. 6, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), the court is unable to dispose of this particular matter without a decision by the Board on the amount due the plaintiff as equipment ownership expense during the standby period (unless the parties waive such administrative decision).

Of course, the allowance to the plaintiff for equipment ownership expense during the standby period should not duplicate any amount which the Board allowed the plaintiff for equipment ownership expense in connection with the dismantling and restoration operations (which will be discussed in the immediately succeeding section of this opinion).

### Post-Termination Dismantling and Restoration Expense [14]

■ The plaintiff complains that the Board erroneously allowed it only $116,000 as reimbursement for the labor costs and equipment ownership expense involved in dismantling the facilities which the plaintiff had established in connection with the performance of work under the contract, and in restoring the site to its original condition.

In the proceedings before the Board, the plaintiff claimed $85,424.55 for the post-termination labor costs involved in dismantling its facilities and restoring the site. The Board refused to allow this amount. After referring to pertinent evidence in the administrative record, the Board said:

\* \* \* On the record as a whole we find that somewhat less than half of the claimed labor costs can be allowed as reasonable termination expense. We fix the amount at $38,000.

Since the evidence before the Board showed that the plaintiff was unable clearly to connect all the post-termination labor costs of $85,424.55 with work that related to the dismantling and restoration operations, the Board was justified in declining to allow the plaintiff the entire amount of $85,424.55 as labor costs in determining the amount due the plaintiff as reimbursement for its post-termination expenses in dismantling facilities and in restoring the site.

On the other hand, the figure of $38,000 which the Board allowed the plaintiff as labor costs with respect to this aspect of the termination expenses was a "jury verdict" type of determination. As a practical matter, it appears that the Board was justified in adopting such an approach in order to dispose of this complicated administrative proceeding without additional delay, since there was really no way of allocating, with mathematical accuracy, the plaintiff's post-termination labor costs of $85,424.55 as between the dismantling and restoration operations, on the one hand, and activities that were outside the scope of the formula for allowable termination expenses, on the other hand.

The court, upon an independent review of the pertinent evidence in the administrative record, might well conclude that the Board's "jury verdict" allocation of $38,000 to the item of labor costs involved in the post-termination dismantling and restoration operations was too low. However, the court would not be justified in undertaking such an independent review of the evidence, since the Board's "jury verdict" allocation does not seem to have been an arbitrary or

14. Neither plaintiff nor defendant excepts to the rulings of the trial commissioner under this heading.

unreasonable one, and is supported by substantial evidence.

In connection with its claim for reimbursement on account of the post-termination expenses involved in dismantling facilities and restoring the site, the plaintiff asserts that it was entitled to $129,937 as equipment ownership expense on pieces of equipment that were used in the dismantling and restoration operations.

With respect to this aspect of the plaintiff's claim, the Board stated:

* * * We are satisfied that appellant [plaintiff] made a bona fide effort to determine actual equipment usage time * * *. For the most part the hours charged for individual pieces of equipment appear reasonable, considering the work involved, but in a few instances the hours claimed are open to question. * * * The rates at which appellant figures equipment ownership costs are the same as those which we have already found to be excessive [in connection with the plaintiff's claim for reimbursement of equipment ownership expense during the pre-termination period]. After making adjustments for what we consider excessive rates and usage time, we find that 60 percent of the amount claimed, or $78,000, is the fair and reasonable amount to which appellant is entitled for use of equipment for termination work.

In view of his prior ruling that the AGC Schedule rates should not be used for interest, taxes, storage, and insurance, Commissioner White agreed with the Board's statement that use of the AGC rates was "excessive". We do not, of course, concur in that position (see Part I, *supra*) but we need not upset the Board's ultimate determination since plaintiff does not except to the commissioner's ruling upholding the Board's decision with respect to post-termination dismantling and restoration expense (see note 14, *supra*).

The Board was justified in determining, on the basis of the evidence in the administrative record, that the plaintiff had failed to prove that the pieces of equipment involved in this claim had been used in the dismantling and restoration operations for all the time alleged by the plaintiff. Therefore, the Board was warranted in refusing to allow the plaintiff the entire amount of $129,937 claimed by the plaintiff as equipment ownership expense on the equipment used in the dismantling and restoration operations.

The Board again made a "jury verdict" determination in holding that 60 percent—or $78,000—of the amount claimed by the plaintiff as equipment ownership expense in connection with the post-termination dismantling and restoration operations was "the fair and reasonable amount" to which the plaintiff was entitled. What has been said previously in connection with the Board's action in fixing the amount of $38,000 as the allowance for labor costs in connection with the dismantling and restoration operations is equally applicable here.

Therefore, it is concluded that the Board's action in allowing the plaintiff $116,000 as reimbursement for labor costs and equipment ownership expense in connection with the post-termination dismantling and restoration operations is upheld against the plaintiff's attack.

In its fourth counterclaim, the defendant attacks the action of the Board in allowing the plaintiff the amounts of $38,000 and $78,000 previously discussed in this part of the opinion, and an additional amount of $9,149 for freight out. The defendant contends that such allowances were too high.

The defendant's basic complaint on this point seems to be that the Board not only reimbursed the plaintiff for its costs in connection with the dismantling and restoration operations at the job site, but also in connection with the dismantling and restoration operations at a storage facility located approximately 25 miles from the job site.

In connection with its preparations for the performance of work under the

contract, the plaintiff established a storage facility at a place known as the Harbor of Refuge, where equipment and materials could be received and stored until needed at the job site. The Harbor of Refuge was located about 25 miles from the job site. After the contract was terminated by the defendant, equipment was moved by the plaintiff from the job site to the Harbor of Refuge and stored there. The plaintiff began to remove equipment from the storage facility at the Harbor of Refuge in July 1964, but did not complete the removal process until the summer of 1965. The program of removal was delayed by the plaintiff because it was hopeful that additional construction work could be obtained in that general area of the Texas Gulf Coast.

Since the storage facility at the Harbor of Refuge was specifically established for use in connection with the plaintiff's operations under the contract, it appears that the plaintiff was entitled to be reimbursed for its costs in dismantling such facility and restoring that site. When the plaintiff established the facility at the Harbor of Refuge, it had no way of knowing that the contract would be terminated when only about one-third of the work had been completed, and that its equipment would be temporarily idled while the plaintiff searched for more work. The plaintiff's decision, based upon a reasonable exercise of business judgment, to continue storing part of the equipment at the Harbor of Refuge for more than a year while looking for other work does not provide a fair basis for denying the plaintiff reimbursement for its costs in dismantling the storage facility and restoring that site.

The defendant is not entitled to recover on its fourth counterclaim.

*Post-Termination G & A Expense* [15]

The plaintiff takes the position that the Board should have allowed it $126,999 as reimbursement for G & A expense during the post-termination period.

This claim covers most of the home-office expense recorded on the plaintiff's books of account for the 16-month period between April 1, 1964 (the work under the contract was terminated a few days earlier, on March 27, 1964) and July 31, 1965 (the contracting officer made his unilateral determination on July 15, 1965, regarding the amount due the plaintiff by reason of the termination).

In passing upon this particular claim, the Board said:

* * * Appellant [plaintiff] has cited no authority or precedent for allowing post-termination G & A as such, as we know of none. * * *

In delineating the post-termination expenses allowable to the plaintiff, paragraph (e) of clause 23 of the contract authorized reimbursement for:

(ii) the reasonable cost of the preservation and protection of property * * *; and *any other reasonable costs incidental to termination of work under this contract,* including expense incidental to the determination of the amount due to the Contractor as the result of the termination of work under this contract. [Emphasis supplied.]

The language just quoted indicates that it was the purpose of this provision to authorize and require reimbursement to the plaintiff for those costs—and only for those costs—which were clearly incidental to the termination of the work under the contract. The plaintiff's home-office overhead after the work under the contract had been terminated on March 27, 1964, related to the plaintiff's existence as an ongoing organization, and was not "incidental to termination of work under this contract." Consequently, the Board was correct in rejecting the plaintiff's claim for G & A expense, as such, during the post-termination period.

---

15. Plaintiff does not except to this adverse ruling of the trial commissioner.

Perhaps it should be mentioned in this connection that reimbursement for salaries or other expenses of home-office personnel directly involved in the termination and settlement of the contract could properly be allowed; and that the Board did allow the plaintiff $16,684 to cover the salaries of two officers, an engineer, and a typist for specified periods of time; $5,084 for travel expenses; and $1,000 for miscellaneous expenses (telephone, car rental, etc.).

### Post-Termination Legal Expense [16]

The plaintiff asserts in the present action that the Board erred in allowing it only $14,000 to cover attorneys' fees for services rendered in connection with the preparation of the plaintiff's termination claim between the date when the contract was terminated and the date on which the plaintiff appealed to the Corps of Engineers Board of Contract Appeals from the contracting officer's decision on the termination claim.

The evidence in the administrative record indicates that the plaintiff had received a bill in the amount of $38,214 from the law firm of Carlsen, Greiner & Law, of Minneapolis, Minnesota, for legal services rendered in connection with the preparation of the plaintiff's termination claim. At the hearing before the Board, Charles E. Carlsen, head of the law firm just mentioned, testified that he and his firm were members of the Hennepin County (Minnesota) Bar Association; that this association prescribed a minimum fee of $25 per hour for the performance of legal services; that because of his own extensive experience, particularly in the field on construction contracts, his services were charged for at the rate of $40 per hour, or $300 for an entire day of work performed in Minneapolis, or $450 for an entire day of work performed elsewhere; that the witness was assisted in this case by a younger attorney in his law firm, for whose work a charge at the minimum rate of $25 per hour was made; and that these charges were reasonable.

Neither Mr. Carlsen nor any other witness furnished evidence to the Board regarding the amount of time which the attorneys severally devoted to the task of preparing the plaintiff's termination claim, except that Mr. Carlsen testified generally that the task was a complicated one and required a great deal of time. Furthermore, no evidence was presented to the Board regarding travel or other expenses incurred by the attorneys in connection with the preparation of the termination claim.

In disposing of this claim for attorneys' fees, the Board said:

> * * * We find that 400 hours of legal work in connection with preparing appellant's settlement claim and presenting it to the contracting officer is the maximum time that can be justified by the facts of record. We include in that total 14 days of conferences with the contracting officer, 20 days of conferring with and advising appellant's officers, and 16 days of research on the legal problems involved (the number and complexity of which we have, in part, judged from the "Contractor's Memorandum" submitted to the contracting officer before he prepared his unilateral determination). Adding $2,000 for expenses to the fee of $12,000 for 400 hours at $30 an hour, we reach $14,000 as the amount to be allowed for legal fees as part of appellant's settlement costs.

As previously indicated, the administrative record does not contain evidence showing either the exact or the approximate amount of time that was devoted to the preparation of the plaintiff's termination claim by the different attorneys who worked on it, or the amount of travel or other expenses which they incurred in this connection. Consequently, the Board correctly held that the plaintiff had failed to establish its entitle-

16. Plaintiff does not challenge this holding of the commissioner.

ment to $38,000+ as reimbursement for post-termination legal expense.

Furthermore, the plaintiff has not referred the court to evidence in the administrative record refuting the reasonableness of the Board's "jury verdict" determination that 400 hours of legal work at $30 per hour, plus $2,000 for expenses, represented a proper allowance for the legal services involved in the preparation of the plaintiff's termination claim.

Accordingly, the plaintiff has not established its right to recover any additional amount on the claim relative to post-termination legal expense.

### Expense Involved in Terminating Lawsuit by Subcontractor [17]

In the petition, the plaintiff complained that the Board failed, by $15,236.39, to allow it reimbursement in full for the expense involved in terminating a lawsuit by a subcontractor, King Fisher Marine Service, Inc. ("King Fisher"), against the plaintiff. However, the plaintiff's motion for summary judgment and supporting brief do not attack the Board's action in determining the amount due the plaintiff in connection with the disposition of the King Fisher litigation. Consequently, the plaintiff has waived this particular claim, as alleged in the petition.

The defendant's first counterclaim, however, seeks to recover from the plaintiff the sum of $90,000 which the Board allowed the plaintiff to cover the judgment, court costs, and legal fees paid by the plaintiff in connection with the King Fisher litigation.

The plaintiff and King Fisher entered into a subcontract whereby King Fisher was to haul stone in its barges to the site of the jetties which the plaintiff was to construct under the prime contract. In November 1963 (which was 4 months before the defendant terminated the prime contract), the plaintiff terminated the King Fisher subcontract for default. King Fisher thereafter filed two suits against the plaintiff in the United States District Court for the Southern District of Texas. One suit, seeking damages in the amount of $300,000, alleged that the plaintiff had breached the subcontract (1) by negligently loading stone on, and unloading stone from, King Fisher's barges, with the result that the barges were damaged, and (2) by unilaterally terminating the subcontract. The second suit was instituted under the Miller Act (40 U.S.C. § 270a et seq. (1964)) and alleged that the plaintiff had failed to pay King Fisher $31,389.18 for labor and services furnished by King Fisher as subcontractor under the plaintiff's prime contract with the Government. The two suits were consolidated for trial.

The District Court announced its decision in favor of King Fisher on March 25, 1965. With respect to King Fisher's breach-of-contract claim, the District Court found that the plaintiff had breached the subcontract (1) by overloading King Fisher's barges, dropping rocks onto the decks of the barges, and driving trucks onto the barges in the unloading process, and (2) by terminating the subcontract in November 1963.

Thereafter, the parties stipulated that the total amount of the damages sustained by King Fisher was $110,000, and the court ordered the plaintiff to pay King Fisher that amount, together with court costs.

The sum of $31,389.18, representing the amount for which King Fisher had sued the plaintiff under the provisions of the Miller Act, apparently was included by the plaintiff and the defendant in the figure of $3,575,559 which they agreed upon as the total amount expended by the plaintiff in the nature of direct costs. In the administrative proceeding which is under review here, the Board allowed the plaintiff $90,000 as additional reimbursement to cover the remainder of the amount which the plaintiff paid to King Fisher in satisfac-

---

17. Neither plaintiff nor defendant excepts to the commissioner's rulings under this heading.

tion of the latter's judgment, and to cover court costs and attorneys' fees paid by the plaintiff in connection with that litigation.

In its first counterclaim, the defendant contends that the Board erred in allowing the plaintiff the sum of $90,000 mentioned in the preceding paragraph.

It has been noted that the plaintiff was entitled to be reimbursed for the total cost of all contract work performed prior to the termination of the contract. However, it was necessary that a particular expense be reasonably incurred in order to be reimbursable (ASPR 15–201.2, 15–201.3). In this connection, it might seem as a matter of first impression that the expense incurred in satisfying a subcontractor's judgment on a breach-of-contract claim against the plaintiff could hardly be regarded as coming within the category of an expense reasonably incurred. Such a conclusion is not necessarily correct.

For example, there is evidence in the administrative record indicating that although the plaintiff's methods of loading stone on King Fisher's barges and of unloading stone from the barges caused some damage to the barges and thereby breached the plaintiff's implied obligation under the subcontract to avoid damaging the barges, the plaintiff's methods of loading and unloading were in accordance with the customary practice at the time. This is substantial evidence supporting the Board's conclusion that the expense involved in repairing the barges (through the payment of King Fisher's judgment and the costs incident thereto) was an expense reasonably incurred and, therefore, was reimbursable under paragraph (e) of clause 23 of the contract.

With respect to the plaintiff's action in terminating the subcontract with King Fisher, there is evidence in the administrative record to the effect that after King Fisher's barges were damaged in the respects previously mentioned, a controversy arose between the plaintiff and King Fisher over the question of who was responsible for repairing the barges; that this controversy continued for a period of approximately 3 months; that the Division Engineer of the Corps of Engineers became concerned over the barging situation and urged the plaintiff to take some action on the matter; that the plaintiff sought advice from its attorney in Minnesota and also from its local attorney in Texas; and that it was ultimately decided that the subcontract should be terminated, as a matter of sound business judgment.

There is also evidence in the administrative record indicating that a substantial modification of the King Fisher subcontract would have been required because of changed conditions, if the subcontract had not been terminated by the plaintiff in November 1963.

The Board concluded that the plaintiff's decision to terminate the subcontract with King Fisher was "one that a prudent business man would take in the circumstances"; and, accordingly, that the expense to the plaintiff flowing from the decision to terminate the subcontract was reasonably incurred and allowable. The Board's conclusion finds substantial support in the evidence previously summarized.

For the reasons stated, the defendant is not entitled to recover in its first counterclaim.

### Cost of Barging Stone [18]

In its second counterclaim, the defendant alleges that after the termination of the subcontract with King Fisher, the plaintiff undertook the task of barging the remainder of the stone to the job site; that the Board allowed the plaintiff $210,046 as reimbursement for the expense involved in barging such stone; that under the plaintiff's subcontract with King Fisher, the stone could have been barged at the subcontract rate of 24 cents per ton, or a total of $18,113 for 75,471 tons of stone; and, therefore, that the defendant is entitled to recover

---

18. Defendant does not attack this part of the trial commissioner's opinion.

$191,933 from the plaintiff, representing the difference between $210,046 and $18,113.

What has been said in the immediately preceding section of this opinion regarding the plaintiff's action in terminating the subcontract with King Fisher is dispositive of the defendant's second counterclaim. The Board concluded— and on the basis of substantial evidence —that the plaintiff acted reasonably in terminating the subcontract with King Fisher. Having terminated that subcontract, the plaintiff was certainly entitled to transport the remainder of the stone to the job site itself, instead of trying to enter into another subcontract covering this phase of the work under the prime contract. The Board found that the plaintiff's barging costs were reasonable; and the portions of the administrative record cited by the defendant in support of its second counterclaim do not clearly refute the Board's finding.

Furthermore, there is no way of determining with certainty what the cost of transporting the remainder of the stone under the King Fisher subcontract would have been if the subcontract had not been terminated by the plaintiff. There is in the administrative record evidence indicating that changed conditions would have required a substantial modification of the subcontract if it had not been terminated in November 1963.

The defendant is not entitled to recover on its second counterclaim.

### Profit [19]

In its sixth counterclaim, the defendant alleges that the Board erred in allowing the plaintiff $275,275 for profit.

Paragraph (3) of clause 23 of the contract prescribed a formula for a profit allowance to be made to the plaintiff if the contract should be terminated by the defendant, but there was a proviso attached to the effect "that if it appears that the Contractor would have sustained a loss on the entire contract had

it been completed, no profit shall be included or allowed * * *."

The defendant points out that, when the contract was terminated, approximately 73 percent of the period allowed for the completion of the work had elapsed, but only about one-third of the work had actually been accomplished. The defendant infers that the plaintiff would have sustained a substantial loss if it had completed the work under the contract.

The defendant's position on this point is not sufficiently convincing to warrant a judgment on its sixth counterclaim, because the evidence in the administrative record indicates clearly that changed conditions would have required a substantial modification of the contract if it had not been terminated— and, indeed, that the defendant, in terminating the contract, was motivated by a desire to avoid the necessity of such a modification.

It is not possible to determine what the plaintiff's financial experience would have been in completing the work if the defendant had not terminated the contract. Therefore, the defendant has not established its right to recover on the sixth counterclaim.

### CONCLUSION

For the reasons stated, the plaintiff's motion for summary judgment is partially allowed, in that the plaintiff is entitled to recover on its claim for tire expense ($35,958), and on its claim for standby equipment ownership expense (amount of recovery not yet determined), and it is entitled to have its claim for pre-termination equipment ownership expense administratively determined under the standards set forth in Part I, *supra*. Otherwise, the plaintiff's motion for summary judgment is denied, and the petition is dismissed as to the plaintiff's other claims.

The defendant's cross-motion for summary judgment is partially allowed to

---

19. Defendant does not except to this portion of the commissioner's opinion.

the extent that plaintiff's motion is denied, and also in that the defendant is entitled to recover on its third counterclaim ($168.56). Otherwise, the defendant's cross-motion is denied, and the first, second, fourth, fifth, and sixth counterclaims are dismissed.

Further proceedings are suspended in this court under Rule 167 for a period of six months to allow the parties to obtain further administrative consideration of plaintiff's claim for pre-termination equipment ownership expense, and also of the amount due plaintiff on its claim for standby equipment ownership expense.