**QUALITY ASPHALT PAVING, INC., an Alaska corporation, Appellant/Cross–Appellee,**

v.

**STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FA-CILITIES, Appellee/Cross–Appellant.**

Nos. S–10154/10183.

Supreme Court of Alaska.

June 13, 2003.

---

Sam E. Baker, Jr., and William K. Renno, Oles, Morrison, Rinker & Baker, LLP, and David J. Schmid and Eric R. Cossman, Law Offices of David J. Schmid, Anchorage, for Appellant/Cross–Appellee.

Paul R. Lyle and E. John Athens, Jr., Assistant Attorneys General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

We consider in these cross-appeals whether a hearing officer erred in awarding costs and prejudgment interest to Quality Asphalt Paving, Inc. after the State of Alaska exercised the termination-for-convenience clause in Quality's public works contract. Both parties dispute the award and advance conflicting interpretations of the contract. We conclude that substantial evidence supports the cost awards and that the hearing officer did not misinterpret the contract, but that Quality was not entitled to prejudgment interest. We therefore affirm the superior court's appellate decision which upheld the cost awards but vacated the prejudgment interest award.

## II. FACTS AND PROCEEDINGS

These appeals concern a highway construction contract for the Chena Hot Springs Road widening project that the State of Alaska, Department of Transportation (DOT) terminated for convenience shortly after awarding the contract to Quality Asphalt Paving, Inc. (Quality).[1]

Quality successfully bid on the project on April 30, 1996. The state issued Quality a letter of intent to award the contract on May 2. On May 17 the state authorized Quality to proceed with work on the $10.76 million contract. Although the parties dispute the exact date, as of late May or early June both parties believed a buried utility cable conflicted with the project plans. Quality advised the state that delaying the project would cost about $30,000 per day. After the parties failed to resolve the problem, the state on June 19, 1996 terminated the contract under the termination-for-convenience clause, which allows DOT to end a contract "whenever, for any reason, the Contracting Officer shall determine that such termination is in the best interest of the Department." As it turned out, the parties discovered on June 20 that there were no conflicting buried utilities cables, but by then the contract had been terminated and Quality had begun notifying its suppliers and subcontractors.

On September 10, as provided for in the termination-for-convenience clause, Quality submitted to the state a claim for damages and costs Quality claimed the termination caused Quality to incur. Quality alleged that the state owed it $4,577,215. The state conducted an audit of Quality's claim. The state's audit, completed in February 1997, recommended paying Quality $10,358. The state and Quality could not reach agreement after the audit. They continued to disagree about claims for mobilization costs, demobilization costs, standby costs, overhead, and prejudgment interest. We discuss in Part III the facts relevant to the appellate disputes.

---

1. The termination-for-convenience clause provides: "The performance of work under the contract may be terminated by the Department in accordance with this section in whole or in part, whenever, for any reason the Contracting Officer shall determine that such termination is in the best interest of the Department."

DOT's contracting officer issued a decision on the termination claim in August 1997. Quality appealed the contracting officer's decision to DOT's commissioner in September 1997.

The commissioner appointed as hearing officer Leroy J. Barker, an attorney with substantial experience in commercial, contract, and construction litigation who had previously served as a hearing officer for the State of Alaska and the Municipality of Anchorage in construction disputes. The hearing officer's June 30, 1998 decision recommended awarding Quality $1,945,857.79 plus prejudgment interest. The commissioner adopted the hearing officer's decision in July 1998.

Quality appealed the commissioner's decision to the superior court, which issued a decision in January 2001. The state cross-appealed aspects of the agency decision. The superior court vacated Quality's prejudgment interest award but affirmed the commissioner's decision in all other respects. Quality then filed a petition for a rehearing on the issue of prejudgment interest. The superior court denied the petition.

Quality appeals the superior court's decision vacating the prejudgment interest award, and both Quality and the state appeal the award or denial of specific claim items.

## III. DISCUSSION

The contract's termination-for-convenience clause allowed DOT to terminate "[t]he performance of work under the contract ... in whole or in part, whenever, for any reason the Contracting Officer shall determine that such termination is in the best interest of the Department." Once the state serves a notice of termination, this clause requires the contractor to stop all work, place no further orders for materials, and cancel all existing orders, among other things.

The clause permits the contractor to pursue certain claims due to the state's termination of the contract. This provision explains that "payment for partially completed work will be made either at agreed prices or by time and materials methods as described" elsewhere in the contract. Additionally, the contractor must:

submit to the Contracting Officer, his claim for additional damages or costs [not otherwise covered]. Such claim may include such cost items as reasonable idle equipment time, mobilization efforts, bidding and project investigative costs, overhead expenses directly allocable to the project termination and not covered under work paid for.... The intent of negotiating this claim would be an equitable settlement figure to be reached with the Contractor.

The appeal and cross-appeal concern the cost and damage items Quality may recover under the termination-for-convenience clause.

### A. It Was Not Error To Deny Quality Additional Compensation for Mobilization and Demobilization.

Quality claimed $767,067 of the $1 million its successful bid specified for mobilization and demobilization costs. The hearing officer awarded Quality a total of $449,621 for this item. "Mobilization" covers preparatory work and operations, including movement of personnel, equipment, and supplies to the job site. "Demobilization" covers equivalent activities upon completion of the project. The termination-for-convenience clause allows recovery for "mobilization efforts." Although Quality's project bid included an amount for the "mobilization and demobilization" item, it is the standard practice of the industry—and of Quality—to charge only mobilization costs to a project, and to charge demobilization costs as part of mobilization for the next project. Consequently, Quality's arguments on this issue, while directed at the "mobilization and demobilization" award, deal principally with mobilization costs.

#### 1. The mobilization and demobilization award

Quality advances alternative theories supporting its claim for an increase in its award for mobilization and demobilization costs. Quality first argues that as a matter of contract interpretation, it is entitled to recover $767,067 of the $1 million its bid allocated for mobilization and demobilization costs because

it was an "agreed price."[2] The state responds that the hearing officer did not err by basing the award on costs incurred rather than Quality's bid price.

■ We substitute our own judgment on questions pertaining to contract interpretation.[3]

■ The contract specifies that

[T]he Contractor, for and in consideration of the payment or payments herein specified and *agreed to* by the Department, hereby covenants and agrees to furnish and deliver all the materials and to do and perform all the work and labor required in the construction of project Chena Hot Springs Road Widening.

(Emphasis added.) Quality argues that "agreed to" is equivalent to an "agreed price." The hearing officer ruled that "[m]obilization was not an 'agreed price' since it was not agreed to by the parties." We agree with the hearing officer. The contract term that Quality relies on cannot be read in isolation. The second clause clearly links "payments ... agreed to" with "[Contractor] hereby covenants and agrees to furnish and deliver *all the materials* and to do and perform *all the work.*" (Emphasis added.) But Quality did not deliver all the materials, and it did not perform all the work. It was therefore permissible for the hearing officer to base Quality's award on costs incurred rather than the "agreed price" for complete performance.[4]

Quality alternatively argues that even if it was correct to base compensation on the costs it actually incurred, "the uncontroverted evidence demonstrates that Quality was entitled to a higher award." Quality contends that the hearing officer's reliance on the state audit report to determine mobilization and demobilization costs was not supported by substantial evidence, and that the state's expert testified to a much higher amount. The state responds that the "hearing officer was not required to accept either party's figure for mobilization.... [T]he hearing officer was free to choose among actual cost data, accounting records, estimates by law and expert witnesses, and calculations from similar projects." (Quotations omitted.)

■ We review the hearing officer's findings of fact under the substantial evidence test.[5]

The hearing officer ruled that

The State's expert testified that $127,000 would be a reasonable sum for mobilization and demobilization costs.... By contrast, [Quality] was claiming $767,067.... [T]he most reasonable figure ... is in the State's Special Audit Report. I am adopting that amount ($287,708, plus profit and overhead), subject to one modification. I am persuaded by the evidence that the barging of equipment ... was triggered by the contractor's anticipation of being awarded this contract.... Therefore, I find that the amount the contractor is entitled to for mobilization and demobilization is the sum of $449,621.

Quality argues that testimony by the state's expert, Ronald Maus, conflicts with the state audit report. Quality argues that Maus's "reasonable person approach"—which returns to the contractor the costs of its performance—results in an award several hundred thousand dollars greater than the hearing officer's award. But Quality's argument simply advocates substituting Maus's

---

**2.** Section 108–1.09 of the contract states that "[p]ayment for partially completed work will be made either at agreed prices or by time and materials methods...." The contract form did not separate amounts for mobilization and demobilization; it scheduled a "lump sum" amount for the "mobilization and demobilization" item.

**3.** *State Farm Mut. Auto. Ins. Co. v. Lawrence,* 26 P.3d 1074, 1076 (Alaska 2001).

**4.** Because Quality had completed only minimal work when the state terminated the contract, we need not consider whether there had been substantial performance entitling Quality to recover the contract price. *Alaska State Hous. Auth. v. Walsh & Co.,* 625 P.2d 831, 836 (Alaska 1980).

**5.** *Estate of Basargin v. State, Commercial Fisheries Entry Comm'n,* 31 P.3d 796, 799 (Alaska 2001). We will uphold the hearing officer's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 800.

award figure for the hearing officer's; it does not demonstrate that the hearing officer's approach was unsupported by substantial evidence. Indeed, there are several methods for calculating mobilization expenses. Maus's approach is one; the hearing officer relied on another. The hearing officer used his own reasonable judgment and determined that figures from the state's special audit report best compensated Quality for mobilization and demobilization.

■ Quality describes Maus's approach in detail. But demonstrating that an alternative method for calculating mobilization costs is valid does not establish that substantial evidence fails to support the hearing officer's award. The hearing officer was presented with a "variety of figures on this matter." He adopted the state's audit figure, but allowed additional barging costs, which were "triggered by the contractor's anticipation of being awarded this contract."[6] The hearing officer permissibly based Quality's award on expert testimony, supporting evidence provided by the audit report, and the hearing officer's own expertise. We therefore hold that substantial evidence supports the hearing officer's mobilization award.

### 2. Quality's separate demobilization theory

Despite Quality's standard practice of charging demobilization costs for one job to its next job as mobilization costs,[7] Quality argues that in this case it should receive $161,581 (before markups) for demobilization as part of a $767,067 award for mobilization and demobilization costs. Quality claims that its normal policy regarding demobilization was inapplicable to the Chena project because the termination left Quality without a new job to which to charge $166,027 in demobilization costs. The state responds that "it is beyond dispute that: (1) [Quality] charges demobilization costs from one project as a mobilization cost to its next project, and (2) [Quality] did not follow this policy in preparing its claim for the Chena project." The state further argues that federal cost accounting principles support the hearing officer's application of Quality's stated demobilization policy.[8]

The hearing officer relied on the state auditor's report, which states that it "is common in the highway construction industry" to charge "[d]emobilization costs ... as mobilization costs of the next project." This finding is consistent with Quality's stated policy about how it treats demobilization costs. Although the termination was unexpected, it was a foreseeable possibility when Quality bid on the state's project. Quality had an opportunity when it submitted its bid to make allowance for the risk that the state would terminate the project, and the consequences to Quality.

■ We hold that the industry standard and Quality's own policy regarding demobilization costs constitute substantial evidence supporting the hearing officer's decision to deny Quality additional demobilization costs.

### B. Quality Is Not Entitled to Additional Compensation for Equipment Standby.

The termination-for-convenience clause allowed recovery for "reasonable idle equipment time," which covers periods during which equipment was idled for reasons other than mobilization or demobilization efforts. The hearing officer determined that this period began May 17, 1996 and ended August

---

6. Quality argues that the state audit report is not substantial evidence. But the hearing officer did not rely exclusively on the audit report. He considered a range of figures in determining Quality's award. It was not error to use the audit report to help identify this range of estimates. We therefore do not need to consider whether the audit report taken alone would have been substantial evidence sufficient to uphold the hearing officer's award.

7. The record contains a written statement on Quality letterhead stating: "It is Quality Asphalt policy to charge projects with mobilization cost only for the bid item mobilization and demobilization. Demobilization charges are charged to mobilization cost of the next project. We believe this is an industry standard for contractors like ourselves who move from job to job."

8. Federal Acquisition Regulation (FAR) 31.105(d)(3) provides that costs incurred at the job site are allowable so long as "the accounting practice used is in accordance with the contractor's established and consistently followed cost accounting practices for all work."

17, 1996, and awarded Quality $901,305.50 for this item. Quality argues that it should recover for equipment standby beginning May 3 and ending October 31; it sought $1,182,000 for this item. The state's cross-appeal argues that the recovery period should be limited to June 19 through July 31.

### 1. Equipment standby between May 3 and May 17, 1996

Quality argues that it was entitled to compensation for equipment standby during the period between its receipt of the state's notice of intent on May 3 and its receipt of the notice to proceed on May 17. Quality claims that the contract terms allowed recovery for standby once the state accepted Quality's bid and issued a notice to proceed. The state responds that Quality would only be entitled to compensation for standby if the state "took some action that subsequently forced [Quality's] equipment to be idle." The state further argues that the terms of the contract do not support Quality's claim.

The state's intent to award letter of May 2, 1996 to Quality stated in part:

The transmittal of these documents constitutes only an intent to award. A Contract will not be in force until these documents are fully executed by the Department and a Letter of Award and Notice to Proceed are issued. You are advised that work prior to that Notice is unauthorized and the State will assume no responsibility for the work, the work site or any event arising therefrom.

9. Sections 101–1.34 and 101–1.35 of the contract state:

101–1.34 NOTICE OF INTENT TO AWARD. The written notice by the Department announcing the apparent successful Bidder and establishing the Department's intent to award the Contract when all required conditions are met.
101–1.35 NOTICE TO PROCEED. A written notice to the Contractor to begin the work establishing the date on which Contract Time begins.
Section 108–1.02 further provides:
108–1.02 NOTICE TO PROCEED. The Notice to Proceed will stipulate the date on which it is expected the Contractor will begin the construction and from which date contract time will be charged. Commencement of work by the Contractor prior to the effective date of

The hearing officer determined that the state's notice of intent to award was not sufficient to grant Quality recovery of standby costs before the state issued the notice to proceed. Quality argues that the notice of intent to award did not define the parties' rights "once [the] notice to proceed [was] issued and a contract [was] in force." Quality argues that, taken together, §§ 101–1.34–.35 and 108–1.02 of the contract permit recovery for work before the effective date of the notice to proceed.[9]

 We hold that the hearing officer did not err in denying Quality compensation for standby from May 3 to May 17.[10] Section 108–1.02 states that "[c]ommencement of work by the Contractor prior to the effective date of the Notice to Proceed constitutes a waiver of this notice and will begin contract time." Quality argues that this provision "make[s] clear that the contractor may properly commence certain types of work prior to the notice to proceed." But Quality incorrectly reads § 108–1.02 in isolation from other portions of the contract. Section 101–1.17 defines "contract time" as "[t]he time allowed under the contract, including authorized time extensions, for the completion of all work by the Contractor." The purpose of § 108–1.02 is not to allow a contractor compensation for starting early, as Quality argues, but rather to prevent a contractor from altering the "calendar days" or "completion date" of a project and thereby avoid liquidated damages.[11]

the Notice to Proceed constitutes a waiver of this notice and will begin contract time. Construction operations shall not be performed before the effective date of the Notice to Proceed. The Contractor shall notify the Engineer at least 48 hours in advance of the time actual construction operations will begin.

10. When the superior court acts as an intermediate court of appeal in an administrative matter, we will substitute our own judgment for questions of law not involving agency expertise, such as contract interpretation. *Williams v. Abood*, 53 P.3d 134, 139 (Alaska 2002); *see also Ellingstad v. State, Dep't of Natural Res.*, 979 P.2d 1000, 1004 (Alaska 1999).

11. Section 108–1.06 defines "calendar days" and "completion date" for purposes of liquidated damages:

Moreover, § 101–1.71 defines "work" as "the act of, and the result of, performing services, furnishing labor, furnishing and incorporating materials and equipment into the project and performing all other duties and obligations required by the contract." Quality did not perform "work" by letting its equipment sit idle from May 3 to May 17. It completed no "work" as defined by § 101–1.71 of the contract until May 17 when it received the state's notice to proceed. Perhaps circumstances could arise in which action by the state would result in the idling of a contractor's equipment after it had started "work," but that was not the case here. Any claim for compensation for Quality's preparation before May 17 was properly categorized by the hearing officer as a claim for mobilization costs.

Because the state's letter of intent to award did not conflict with the contract's provisions, the hearing officer did not err in determining that the letter of intent to award "relieve[d] the State of any responsibility for idle equipment costs incurred between May 2 ... and May 17."

### 2. Equipment standby after August 17, 1996

■ The hearing officer determined that Quality could recover for equipment standby only through August 17, 1996. Quality argues that the hearing officer's decision was not supported by substantial evidence and instead claims that it is entitled to recovery through October 31.[12] It argues that "[t]he Hearing Officer relied on one sentence from a letter from [Quality's] president to three legislators, dated October 13, 1997, ... which stated that [Quality] 'had gone back to work in full force by mid-August [1996].'" Quality alleges that "the undisputed evidence presented at trial ... established that many items of equipment that had been dedicated to the project remained idle after August 17, 1996."

The state responds that substantial evidence supports the hearing officer's finding regarding the standby termination date. The state argues that the letter was only one piece of evidence the hearing officer examined in determining that August 17, 1996 was the appropriate date to terminate standby expenses. The state argues that Quality president, Gordon Hayes, "confirmed [the hearing officer's] interpretation of [Hayes's letter] at the administrative hearing during cross-examination."

The hearing officer's decision stated that it "used August 17, 1996 as the date the dedicated equipment period should terminate.... [This date] is based on [Quality]'s October 13, 1997 letter [stating Quality was able to go back to work in full force by mid-August]."

■ But contrary to Quality's assertion on appeal, other evidence supported the decision. Before issuing the June 1998 proposed decision, the hearing officer heard testimony in May 1998 by Gordon Hayes. At the May 1998 hearing Hayes acknowledged the contents of his October 1997 letter:

Q. Isn't it true that by mid August of 1996, you were back to work in full force?

[Hayes]. I think closer to the end of August.

Q. Would you turn to Exhibit 337 for me, please. This is a letter that you sent to the—to some of your legislators?

[Hayes]. Yes.

Q. Isn't it true that in the last sentence of the first full paragraph of that letter, you told your legislators that you were able to go back to work in full force by mid August?

[Hayes]. Okay. Yes.

The hearing officer also used Blue Book daily equipment rates in calculating the days Quality's equipment was on standby. He

---

*Calendar Days.* When the contract time is specified on a calendar days basis, all work under the contract shall be completed within the number of calendar days specified. The count of contract time begins on the day following receipt of the Notice to Proceed by the Contractor, if no starting day is stipulated therein. . . .

*Completion Date.* When the contract time is specified by a completion date, all work under the contract shall be completed by that date.

**12.** We will uphold the hearing officer's findings if they are supported by substantial evidence. *Estate of Basargin v. State, Commercial Fisheries Entry Comm'n,* 31 P.3d 796, 799 (Alaska 2001).

explained that the standby calculation consisted of counting the work days on which Quality employed specific items of equipment for the Chena project and applying the appropriate Blue Book rate. Quality asserts that the hearing officer erred because he did not fully compensate Quality for "some equipment [that] remained unassigned months past August 17." Quality incorrectly equates "idle" time with recoverable expense. Although the state was obliged to compensate Quality for standby costs due to the state's termination of the contract, it was not Quality's insurer for equipment that remained idle after August 17.

We hold that substantial evidence supports the hearing officer's decision to deny Quality standby compensation after August 17.

### 3. Awarding "idle equipment time" at Blue Book rental rates

■ The state argues in its cross-appeal that the hearing officer erred in awarding idle equipment time to Quality at Blue Book [13] rental rates.[14] The state argues that § 108–1.09 of the contract "expressly prohibits the use of 'published rental rates' in calculating equipment costs for claims." The state claims that the contract instead required Quality to be reimbursed for actual costs. Quality responds that the hearing officer permissibly used Blue Book rates and that his findings are supported by substantial evidence.

Paragraph five of § 108–1.09 describes claims following a termination for convenience:

> After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer, his claim for additional damages or costs not covered above or elsewhere in these specifications. Such claim may include such cost items as reasonable idle equipment time, mobilization efforts, bidding and project investigative

costs, overhead expenses directly allocable to the project termination and not covered under work paid for at agreed unit prices or contract bid prices, legal and accounting charges and other expenses reasonably necessary in claim preparation, subcontractor costs not otherwise paid for, actual idle labor costs if work is stopped in advance of termination date, guaranteed payments for private land usage as part of the original contract, and any other costs or damage items for which the Contractor feels reimbursement should be made. The intent of negotiating this claim would be an equitable settlement figure to be reached with the Contractor. In no event, however, will loss of anticipated profits be considered as part of any settlement.

■ The state argues that the hearing officer erred in concluding that he could award idle equipment time at Blue Book rates under paragraph five of § 108–1.09. The state argues that "the word 'reasonable' modifies the word 'time' in [the second sentence], and not the word 'cost,' " and therefore that paragraph five "requires the rate for idle equipment to be based on actual costs." But the state's narrow construction is defeated by the next-to-last sentence of paragraph five, which states that "[t]he intent of negotiating this claim would be an equitable settlement figure to be reached with the Contractor." The provisions of § 108–1.09 taken together do not imply the narrow construction urged by the state. Rather, they suggest that the hearing officer has broad authority under § 108–1.09 to reach an equitable award.

The state also argues that the contract controls reimbursement for idle equipment time and that the hearing officer had no authority under the termination clause of § 108–1.09 to substitute his judgment and base the award on Blue Book rates rather than actual costs. We disagree. Section

---

**13.** DATAQUEST, RENTAL RATE BLUE BOOK FOR CONSTRUCTION EQUIPMENT (2002). The Blue Book is an annually published "industry-sponsored construction equipment cost guide." 48 C.F.R. § 31.105.

**14.** We review legal questions relating to contract interpretation de novo. *Earth Movers of Fair-*

*banks, Inc. v. State,* 824 P.2d 715, 717 n. 4 (Alaska 1992). We review the hearing officer's ruling on the appropriateness of recovery at Blue Book rates under the substantial evidence standard of review. *Anderson v. State, Dep't of Revenue,* 26 P.3d 1106, 1109 (Alaska 2001).

108–1.09 states in part that the "intent of negotiating [a] claim [is to reach] an equitable settlement figure ... with the Contractor." The state drafted this standard form contract. We will not defer to the state's narrow interpretation of a term that indicates on its face an alternative and reasonable interpretation.[15]

The state cites our decision in *Southeast Alaska Construction Co. (SEACO) v. State*[16] to support its argument that the hearing officer impermissibly applied the Blue Book rate in determining Quality's idle equipment claim. In *SEACO* the superior court concluded that recovery was limited to actual equipment rates even though a contract term plausibly allowed recovery at Blue Book rates.[17] On review we held that "the superior court did not err in refusing to compensate SEACO for the use of extra equipment at Blue Book rental rates."[18] But we did not hold that it would have been error to apply Blue Book rates. We simply held there that the contract did not compel that result.

Similarly, the hearing officer in this case was not compelled to use the Blue Book rates. But he was not forbidden to use them, either. The hearing officer based his decision to employ Blue Book rates on a number of relevant reasons. He stated that "from the testimony and my own experience ... contractors, generally, do not keep equipment costs for the purposes of developing claims." He also pointed out that a "difficulty in not using Blue Book rates is that contractors with different accounting systems would be treated differently." He also explained that industry custom routinely

permits the use of rates such as those found in the Blue Book.[19]

It is this type of expertise to which we defer in reviewing a decision under the substantial evidence standard. Because the hearing officer's decision does not rely on an improper interpretation of the contract, and because his decision relied on substantial evidence, we hold that it was not error to use Blue Book rates in determining Quality's standby costs.[20]

### 4. The "dedicated equipment" theory for idle equipment

The hearing officer awarded Quality compensation for idle equipment time from May 17, 1996 through August 17, 1996. The state contends in its cross-appeal that this was error, because "post-termination idle equipment time is limited to the reasonable time it should take the contractor to remove its equipment from the project site." The state argues that Quality's recovery for idle equipment should not be based on a "dedicated equipment" theory, but instead should be limited to compensating Quality for its idle equipment time from the termination of the contract on June 19 until July 31, when Quality removed its equipment from the job site.

Quality responds that it should be reimbursed for reasonable idle equipment time as provided in the termination-for-convenience clause of the contract.

■ Section 108–1.09 of the contract permits an award of costs for "reasonable idle

---

**15.** *See, e.g.,* 5 MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.27, at 282 (1998) (stating that fact written terms of contract were authored by one party and merely assented to by other may influence court's interpretation of these terms); *see also Rockstad v. Global Fin. & Inv. Co.,* 41 P.3d 583 (Alaska 2002) (construing lease term against lessor responsible for drafting lease); *Little Susitna Constr. Co. v. Soil Processing, Inc.,* 944 P.2d 20, 25 n. 7 (Alaska 1997) (construing terms against party in adhesion contract, but also stating party had bargaining strength relative to other party).

**16.** 791 P.2d 339 (Alaska 1990).

**17.** *Id.* at 341.

**18.** *Id.* at 342.

**19.** The hearing officer did not err in considering FAR guidelines in his decision. We need not decide whether exclusive use of FAR principles would have been error because the hearing officer's decision relied on a number of relevant factors, each of which is supported by the record.

**20.** The state also argues that "the claims clause prohibits the use of Blue Book rates." But § 105–1.17 addresses claims for "additional compensation." Quality's claim for standby costs is not for "additional compensation." The hearing officer therefore did not err in concluding that § 105–1.17 "does not have any application to this case."

equipment time." The hearing officer correctly realized that "a contractor must 'dedicate' equipment to a project once it is awarded the contract." Contractors must be assured that they may maintain some level of minimal readiness, otherwise they would be reluctant to dedicate any equipment to a job site in preparation for a job, and perhaps even after a job is awarded. In determining Quality's standby award, the hearing officer relied on the state's May 17, 1996 notice-to-proceed letter and the statement in Gordon Hayes's October 13, 1997 letter that Quality was back "in full force by mid-August." We hold that substantial evidence supports the hearing officer's decision.[21]

Our own interpretation of the termination-for-convenience clause also leads us to conclude that it was plausible to read the contract to grant recovery for idle time beyond the time for removing equipment from the Chena site. Given evidence that it was the industry custom not to charge demobilization costs to a current project, it is logical to conclude that the words "reasonable idle equipment time" in the termination-for-convenience clause cover something other than removing equipment from a job site. We recognize that this is not the only reading those words might have, but it is a plausible reading shared by the hearing officer and accepted by the commissioner.

The hearing officer applied what he termed the "business judgment rule" to determine what equipment Quality dedicated to the Chena project and the duration of that dedication. The state asserts that the hearing officer erred in applying the dedicated equipment theory doctrine and that this was a legal error. It does not appear, however, that the hearing officer was creating a separate category of recovery that turned simply on whether equipment was "dedicated" or

not. The real question was the duration of idle time, and substantial evidence supported the hearing officer's choice in this regard. We are not prepared to say as a matter of law based on the record here that a termination-for-convenience clause that permits recovery for reasonable idle equipment time precludes recovery after some brief period of removal ends.

The state cites *Nolan Bros. v. United States*,[22] in which the United States Court of Claims examined a termination-for-convenience claim for idle equipment time, as holding that the standby period for idle equipment is limited to the time "immediately following the termination of the contract." The court of claims then proceeded to define "immediately" as 1.6 months based on the facts before it.[23] The essential debate in *Nolan*, an issue not very different from that in this case, was over the length of time for which recovery would be reasonable. As Quality notes, the court in *Nolan* relied on *Brand Investment Co. v. United States*, which explained that

> when the Government ... in effect condemns a contractor's valuable and useful machines to a period of idleness and uselessness, we think that it should make compensation comparable to what would be required if it took the machines for use for a temporary period, but did not in fact use them.[24]

The superior court declined to read *Nolan* and other cases cited by the state to be so persuasive that they compel Alaska courts to hold that idle equipment recovery time must end as soon as equipment reasonably could have been removed from a job site.

The state's final argument is that Quality's "dedicated equipment claim is for loss of anticipated profits," a loss category

---

21. The state also cites cases from other jurisdictions in arguing that the hearing officer impermissibly allowed Quality to recover costs for dedicated equipment. Although these cases may support the choice of a different period than the one the state would choose, they do not alter the conclusion that the hearing officer's choice is supported by substantial evidence. We will not reweigh evidence in light of the state's suggested alternative. We only review the record to ensure that substantial evidence supports the decision.

*Anderson v. State, Dep't of Revenue*, 26 P.3d 1106, 1109 (Alaska 2001).

22. *Nolan Bros. v. United States*, 194 Ct.Cl. 1, 437 F.2d 1371, 1386 (1971).

23. *Id.* at 1386.

24. *Id.* at 1387 (quoting *Brand Inv. Co. v. United States*, 102 Ct.Cl. 40, 58 F.Supp. 749 (1944)).

which is not allowable under § 108–1.09. Section 108–1.09 explicitly allows recovery for reasonable idle equipment time. The hearing officer awarded Quality standby for "equipment" dedicated to or utilized for the project.[25] This award did not grant anticipated profits to Quality and was not contrary to § 108–1.09 of the contract. We therefore conclude that it was not error to grant this award.

### C. Quality Is Not Entitled to Additional Compensation for Unabsorbed Home Office Overhead.

The termination-for-convenience clause allows recovery for "overhead expenses directly allocable to the project termination and not covered under work paid for at agreed unit prices or contract bid prices." Overhead includes organizational, administrative, and other general costs that are incurred for continuing operations. The hearing officer awarded Quality $92,200 for unabsorbed home office overhead. Quality sought an award totaling $365,785.

Quality advances three arguments to support its claim for additional compensation for unabsorbed office overhead. The state responds that Quality's arguments lack merit. We agree with the state.

 Quality first argues that the hearing officer committed "a simple accounting error" in awarding Quality $92,200 for overhead.[26] It argues that amounts the hearing officer denied as to other items should have been added to the overhead award, which Quality calculates should have been $365,785. But Quality does not actually allege an accounting error. Instead, Quality's calculation merely attempts to shift denied items to the overhead category. Giving effect to Quality's argument would circumvent much of the

hearing officer's decision. The hearing officer denied certain claims for reasons his opinion discussed at length. We decline to shift those claims to the overhead category.[27]

Quality next argues that it was error to calculate daily overhead by dividing the overhead by 365 days rather than 184 days, the length of Quality's construction season. The state responds that Quality did not present this issue to the hearing officer and that it is waived. The state also argues that experts for both parties "agreed that unabsorbed overhead (if allowed) should be calculated over a one-year period."

To calculate Quality's overhead award, the hearing officer divided $365,785, the amount of Quality's claimed overhead costs, by 365 days. This resulted in a daily rate of $1,002.15. The hearing officer then multiplied this figure by 92, the number of calendar days he attributed to the state's termination for convenience, and awarded $92,200. Quality cites the following testimony by Ronald Maus, the state's expert, to support its argument that the hearing officer incorrectly calculated its award over 365 days rather than a shorter period reflecting the seasonal nature of Quality's business:

Q. Well, the period in which the overhead was not absorbed included ... some six months of fiscal year 1997 costs; isn't that right?

[Maus]. That's true. But ... the absorption is done in the operating season only, which essentially runs from May 1 through October 31.

The state argues that Quality took this testimony out of context. We agree, because Maus next testified:

Q. Sir, the overhead is fixed and it runs basically consistent year after year—or

---

25. Section 101–1.23 defines "equipment" as "[a]ll machinery together with the necessary supplies for upkeep and maintenance, and also tools and apparatus necessary for the proper construction and acceptable completion of the work."

26. We review questions of fact under the substantial evidence standard. *Basargin*, 31 P.3d at 799.

27. Similarly, we are unpersuaded by Quality's argument that because "neither [the superior

court judge] nor [the hearing officer] are accountants ... they fail to grasp from the very fact of [Quality's] claim calculation that a deductive credit based on the assumed granting of another claim is no longer valid when that other claim is disallowed." The deficiency is not with the decisions of the hearing officer or the superior court, but with Quality's approach. As discussed, this is not an accounting problem but rather an attempt to impermissibly shift losing claims to the amorphous "overhead" category.

month after month after month, all through the winter, right?

[Maus]. That's true.

Q. But the period that they earn monies to absorb that overhead is generally just in the summer months, isn't it?

[Maus]. That's true.

■ The hearing officer reasonably could have concluded from this testimony that overhead costs for a seasonal construction business continue over the course of a year even though revenues are generated primarily during summer months. The hearing officer based his decision on the expert testimony and his own expertise. Substantial evidence supports his decision.

Quality finally argues that "cut[ting] off recovery of a daily calculated rate at August 17, just produces a wholly arbitrary and capricious number that is unrelated to ... the amount of home office overhead that is unabsorbed as a result of the termination." The state responds that the hearing officer's choice of August 17 is supported by the same evidence he considered in deciding Quality's claim for standby costs.

■ It does not matter whether other cutoff dates would have been reasonable because the hearing officer's choice of August 17 was supported by substantial evidence, including Hayes's October 13, 1997 letter.

■ The state's cross-appeal disputes the hearing officer's $92,200 award for unabsorbed overhead. The state argues that this overhead is an indirect cost not chargeable to the state's termination. Because we hold for the reasons discussed in this subpart that

substantial evidence supports the hearing officer's decision, we do not need to consider whether alternative approaches would also have been valid. We will not reweigh evidence when substantial evidence supports the hearing officer's decision.[28]

## D. The Superior Court Did Not Err in Vacating the Commissioner's Award of Prejudgment Interest.

The hearing officer awarded Quality an unspecified sum for "appropriate prejudgment interest." The superior court vacated the award. Quality advances two theories why the superior court erred by vacating the prejudgment interest award.

### 1. Alaska Statute 36.30.685 and our ruling in *Danco Exploration v. State* preclude Quality's recovery of prejudgment interest.

Quality first argues that because its "contract" claim is of the type allowable under AS 09.50.250, prejudgment interest is recoverable under AS 09.50.280.[29] The state responds that Quality's contract claim is the type required to be filed as an administrative appeal under AS 36.30.685.[30] The state therefore argues that Quality cannot bring an action under AS 09.50.250.

Quality appealed the commissioner's decision under AS 36.30.685(a) and Alaska Rule of Appellate Procedure 602(a)(2). Quality asserts that AS 36.30 merely states an "exhaustion requirement" and "simply require[s] ... claimants to exhaust their administrative remedies" before bringing suit under AS

---

**28.** *Anderson*, 26 P.3d at 1109.

**29.** AS 09.50.250 states in part:

A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in a state court that has jurisdiction over the claim. A person who may present the claim under AS 44.77 may not bring an action under this section except as set out in AS 44.77.040(c). A person who may bring an action under AS 36.30.560—36.30.695 may not bring an action under this section except as set out in AS 36.30.685.

AS 09.50.280 states:

If judgment is rendered for the plaintiff, it shall be for the legal amount found due from the

state with interest as provided under AS 09.30.070 and without punitive damages.

**30.** AS 36.30.685 states in part:

(a) A final decision of ... the commissioner of transportation and public facilities under AS 36.30.610, 36.30.635(a), 36.30.650, or 36.30.680 may be appealed to the superior court in accordance with the Alaska Rules of Appellate Procedure.

(b) A final decision of ... the commissioner of transportation and public facilities under AS 36.30.630(b) [hearing of a contract controversy] may be appealed to the superior court for a trial de novo.

09.50.250. We addressed a similar situation in *Danco Exploration, Inc. v. State.*[31] Danco was the winning bidder in a state lease sale.[32] A division of the Department of Natural Resources informed Danco that it forfeited its leases because Danco was late returning documents to the state.[33] Danco appealed this decision to the commissioner of natural resources, who rejected Danco's claim.[34] Danco then appealed the commissioner's decision to the superior court, which reversed the commissioner's decision.[35] Danco attempted to recover prejudgment interest under AS 09.50.280 after the superior court ruled in Danco's favor in its administrative appeal.[36] We held:

> Danco's claim that it could have sued the State in tort or in contract lacks merit. Oil and gas lessees and lease bidders which have grievances with the State must pursue ... administrative procedures[.] ... A party who brings an appeal from a commissioner's decision to the superior court is bound by the result of such an appeal and may not maintain a separate action under [AS 09.50.250].[37]

 Quality argues that *Danco* is distinguishable because "[Quality's] claim is undisputedly a 'contract claim.'" We disagree. This is not an instance in which the difference between bringing a claim under alterna-

tive statutes is merely a matter of form. Quality did not have the option of bringing its claim under AS 09.50.250; that statute expressly provides that a "person who may bring [a procurement action] may not bring an action under [AS 09.50.250] except as set out in AS 36.30.685."[38] But AS 36.30.685(a) did not authorize Quality to file a contract claim under AS 09.50.250. Instead, AS 36.30.685(a) addresses administrative appeals, the process Quality followed.

We assume for discussion's sake that a procurement claim prosecuted in the superior court at a trial de novo under AS 36.30.685(b) is the procurement claim to which AS 09.50.250 refers when it states that a "person who may bring [a procurement action] may not bring an action under [AS 09.50.250] *except as set out in AS 36.30.685.*" (Emphasis added.) We therefore also assume for discussion's sake that a claimant who successfully pursues a procurement claim in a superior court trial de novo under AS 36.30.685(b) may recover prejudgment interest under AS 09.50.280.[39] But we do not have to decide here precisely what type of superior court proceeding would entitle a successful procurement claimant to prejudgment interest because Quality's superior court proceeding was clearly an appeal under

---

31. 924 P.2d 432 (Alaska 1996).

32. *Id.* at 433.

33. *Id.*

34. *Id.*

35. *Id.* at 434.

36. *Id.*

37. *Id.*

38. AS 09.50.250 provides in relevant part: "A person who may bring an action under AS 36.30.560—AS 36.30.695 may not bring an action under this section except as set out in AS 36.30.685."

39. An unsuccessful procurement claimant may seek superior court relief under AS 36.30.685. Whether the superior court proceeding falls under subsection .685(a) or subsection .685(b) depends on the procedure followed at the administrative level. If the claimant has received a hearing at the administrative level, subsection

.685(a) applies, and the proceeding is treated as an administrative appeal. In comparison, subsection .685(b) applies—providing for a superior court trial de novo—if the commissioner of administration or the commissioner of transportation and public facilities decided the claim under AS 36.30.630(b), i.e., by "adopt[ing] the decision of the procurement officer as the final decision without a hearing." AS 36.30.630(b).

Because administrative appeals do not qualify for prejudgment interest, *Danco*, 924 P.2d at 434, and because subsection .685(a) governs traditional administrative appeals of procurement claims, we can safely assume that AS 09.50.250's reference to AS 36.30.685 must be a reference to subsection .685(b). Proceedings under that subsection are distinct from administrative appeals under subsection .685(a), because of the trial de novo provision for claims brought under subsection .685(b). The distinction appears logical because claims presented to the superior court under subsection .685(b) at a trial de novo have the characteristics of traditional contract claims against the state, for which prejudgment interest is recoverable.

AS 36.30.685(a), and was therefore governed by *Danco.*

Quality next argues that "the real issue presented for review is whether the *agency* had the authority to award prejudgment interest to [Quality] on its claim, as the DOT did in the administrative claims proceedings." Quality tries to distinguish its claim by arguing that the state and the superior court wrongly perceived the issue as being whether the *court* could award prejudgment interest. Quality explains that "[t]he doctrine of sovereign immunity applies only to *judicial* actions brought against the State, and has no application to *administrative* proceedings." But we have previously held that "unless interest is specifically authorized by legislative enactment, it may not ordinarily be assessed against the State in any action." [40]

Because Quality could not maintain its claim under AS 09.50.250 and because the state had not specifically authorized prejudgment interest for this type of claim when Quality brought its administrative appeal, the superior court correctly vacated the prejudgment interest award.[41]

## 2. Quality is not contractually entitled to prejudgment interest.

Quality alternatively argues that the express terms of the contract require the state to pay interest and that "the state's immunity to the assessment of such interest is waived along with its waiver of sovereign immunity for claims arising from the contract." Quality further urges us to follow the holding of the Washington Supreme Court in *Architectural Woods, Inc. v. State.*[42] The court there reversed "the trial court's denial of interest to the plaintiff based on sovereign immunity and [held] that any sovereign immunity possessed by [the state] was waived by its entry into an authorized contract."[43] The court also held that "such waiver extended to every aspect of its contractual liability including liability for interest."[44] The Washington court based its reasoning on principles of fairness and the concept that the state should not expect favorable treatment.[45] The state here responds that in Alaska, "the authorization to pay interest may not be implied, but must be specifically and explicitly authorized solely by legislative enactment."

The state is correct. Alaska Statutes 09.50.250 and 09.50.280 provide limited exceptions to the general rule and permit awards of prejudgment interest against the state in tort and contract claims.[46] Given the statutory approach the legislature has chosen, the considerations that persuaded the Washington Supreme Court in *Architectural Woods* have no application here.

We have observed that "the prohibition against prejudgment interest can easily work an injustice on a party who has contracted with the state."[47] The legislature apparently agreed when it enacted AS 36.30.623 in

**40.** *Stewart & Grindle, Inc. v. State,* 524 P.2d 1242, 1245 (Alaska 1974). The legislature has since authorized the payment of interest for claims, like Quality's, filed under AS 36.30.620. *See* AS 36.30.623. But this statute did not become effective until October 2001 and therefore does not apply to Quality's claim. Ch. 98, § 1, SLA 2001 (Effective Oct. 8, 2001). The state argues that "[t]he absence in 1996 of a statute like AS 36.30.623 ... significantly undercuts [Quality's] argument.... There would have been no need to enact AS 36.30.623 if AS 09.50.250–.280 were an explicit waiver of immunity for payment of interest on DOT contract claims." We agree with the state's argument, but our holding does not depend upon it because Quality's claim is clearly an administrative appeal that falls outside AS 09.50.250.

**41.** *See Samissa Anchorage, Inc. v. State,* 57 P.3d 676 (Alaska 2002) (reaffirming that AS 09.50.250

and .280 do not allow for prejudgment interest in cases brought as administrative appeals that could not have been brought under section .250).

**42.** 92 Wash.2d 521, 598 P.2d 1372 (1979).

**43.** *Id.* at 1377.

**44.** *Id.*

**45.** *Id.*

**46.** *Danco Exploration, Inc. v. State,* 924 P.2d 432, 434 (Alaska 1996); *Stewart & Grindle, Inc. v. State,* 524 P.2d 1242, 1245 (Alaska 1974).

**47.** *State v. Phillips,* 470 P.2d 266, 272 (Alaska 1970) (quotations omitted) (citing *Wright Truck & Tractor Serv., Inc. v. State,* 398 P.2d 216, 220 (Alaska 1965)).

2001, but the legislature did not choose to make that statute retroactive. It consequently does not assist Quality in this case.[48]

### E. The Hearing Officer Did Not Err in Awarding Quality Recovery for a Utility Delay or in Allowing Quality To File a Late Utility Delay Claim.

Quality filed a late claim for the utility delay that held up the project. The hearing officer included the "utility delay component" in awarding Quality recovery for mobilization and demobilization, standby, and overhead. The state's cross-appeal argues that the hearing officer erred in considering the claim because Quality waived the claim by not giving adequate, timely notice of the claim, and because § 105–1.06 of the contract precluded monetary recovery for utility delays. Section 105–1.06 states in part:

> It is understood and agreed that the Contractor has considered in his bid all of the permanent and temporary utility appurtenances in their present or relocated positions as shown on the plans, and the completion dates for various utility adjustments as may be stated in the Special Provisions, and that no additional compensation will be allowed for any delays, inconvenience or damage sustained by the Contractor due to any interference from the said utility appurtenances or the operation of moving them.

■■ The state emphasizes the portion of the provision that states "no additional compensation will be allowed for any delays." But the cited provision clearly refers to delays caused by known utility appurtenances—i.e., those "as shown on the plans." Because the delay arose due to an unforeseen (although ultimately nonexistent) utility conflict,[49] we reject the state's argument that § 105–1.06 precluded recovery for the utility delay.[50]

■■ The hearing officer based his decision to allow Quality's delay claim to go forward on the state's recognition of the perceived utility conflict in early June and the state's efforts to resolve it. He noted that "the State was aware that the contractor was not going to be able to conduct its work until the utility conflict had been resolved," and then determined that once the state terminated the contract, "[c]learly ... the State recognizes that the contractor will be submitting a claim." The hearing officer observed that, even though the utility delay claim was not separately presented, "the State was aware generally of the nature of the claim."

The hearing officer determined that a critical piece of evidence supporting his decision was documentation of a June 6, 1996 meeting between state and Quality representatives. He found the document to be "consistent with [Quality's] letter of the same date expressing its concerns regarding the utility conflict that was discussed at the preconstruction conference." Substantial evidence therefore supports his decision that "[Quality] was delayed as a result of the utility conflict and that delay is a compensable damage item."[51]

### F. It Was Not Error To Deny the State's Mutual Fault Counterclaim.

The state argues that Quality was mutually at fault for the termination because Quality did not obtain a "utility locate" to identify any utility conflicts before construction started. The state alleges that "a reasonable contractor" would have obtained a utility locate when first advised of the previously undisclosed buried cable. The state argues that § 105–1.06 required Quality to obtain the locate. That section provides: "Before starting construction, the Contractor shall

---

**48.** *See supra* note 40.

**49.** The contract allows the state to make changes under §§ 105–1.06 and 104–1.02 in the work requirements "should conflicts occur or utilities be discovered that are not shown on the plans that require adjusting." But these provisions do not impact Quality's delay claim, which is based instead on the state's termination.

**50.** We review questions of contract interpretation de novo. *Earth Movers,* 824 P.2d at 717 n. 4.

**51.** Because the delay claim is established on the alternative grounds discussed in this subpart, we do not need to consider Quality's response that the state breached express and implied warranties.

request all utility owners to locate their utilities and at points of possible conflict the Contractor shall uncover the located utilities." Quality responds that the contractor's duty to request a utility locate does not arise until shortly before excavation.

 The hearing officer ruled that "a contractor normally does not obtain a locate until shortly before he begins actual excavation." His ruling did not conflict with § 105–1.06 and was based on evidence of a June 7, 1996 meeting in which the utility manager stated that there "existed [a] ... cable in the center of the right-of-way." Substantial evidence supports the hearing officer's decision to deny the state's claim of mutual fault.[52]

### G. The Issue Whether the Attorney General Had Authority to Appeal the Commissioner's Decision Is Waived.

 Quality argues that DOT's commissioner "is vested with sole statutory authority to make the final decision on behalf of the State regarding [Quality's] claims, [and that] the Attorney General had no authority to challenge or appeal the Commissioner's decision." We do not need to reach this issue because Quality raises it for the first time on appeal, and because it is not so compelling that it would justify review for plain error.[53] Nonetheless, we note that Quality's argument does not appear to be consistent with our prior decisions or the Alaska statutes.[54]

## IV. CONCLUSION

We AFFIRM the superior court's decision which affirmed Quality's individual claim awards but which vacated the award for prejudgment interest.

---

52. We review this interpretation issue under the substantial evidence standard because the interpretation of § 105–1.06 requires extrinsic evidence. *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997).

53. *Von Stauffenberg v. Comm. for Honest & Ethical Sch. Bd.*, 903 P.2d 1055, 1061 (Alaska 1995).

54. *Pub. Defender Agency v. Superior Court, Third Judicial Dist.*, 534 P.2d 947, 950 (Alaska 1975); AS 44.23.020(3), (8).